******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DANIEL G.*

(AC 33653)

DiPentima, C. J., and Beach and McDonald, Js.

*Argued November 27, 2012—officially released January 21, 2014*

(Appeal from Superior Court, judicial district of New London, geographical area number ten, A. Hadden, J.)

*Jon L. Schoenhorn*, with whom, on the brief, was *Irene J. Kim*, certified legal intern, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *Rafael I. Bustamante*, assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Daniel G., appeals from the judgment of conviction, rendered after a jury trial, of increasing the speed of a motor vehicle in an attempt to escape or elude a police officer in violation of General Statutes § 14-223 (b) and interfering with a police officer in violation of General Statutes § 53a-167a. On appeal, the defendant claims that (1) the evidence was insufficient to support his conviction under § 14-223 (b); (2) § 14-223 (b) is unconstitutionally vague as applied to the facts of this case; (3) the trial court improperly failed to charge the jury on two theories of defense; and (4) the defendant was deprived of the right to a fair trial as a result of prosecutorial impropriety. We are not persuaded and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On April 23, 2009, at approximately 4:45 p.m., New London police Officer Deana Nott responded to a motor vehicle accident and drove her police cruiser to a CVS parking lot located on Jefferson Street. After speaking with the individuals involved in the accident, including Dustin Colburn, Nott returned to her cruiser to complete some paperwork. Nott noticed a white van pull into a parking space in the CVS parking lot and saw the defendant exit with a small child. A few moments later, while approaching Colburn, the defendant commented on Nott's abilities as a police officer. The defendant asked Colburn if Nott was issuing Colburn a "ticket . . . ." The defendant then said that Nott was "[o]n the wrong end of a lawsuit" and asked Colburn for his name and telephone number. At this point, Nott exited her cruiser and instructed the defendant to "step away" several times. The defendant ignored Nott's instructions and continued his comments about her. Nott determined that she could not complete her investigation of the motor vehicle accident as a result of the defendant's actions, and requested assistance from her fellow police officers. Upon hearing the response to Nott's request, the defendant entered his van and departed from the CVS parking lot onto Jefferson Street.

When requesting assistance, Nott had spoken with Todd Bergeson, a sergeant in the New London Police Department and the acting shift supervisor. Nott asked Bergeson to initiate a motor vehicle stop and issue the defendant "a ticket for interfering or . . . creating a disturbance." Bergeson was located nearby at a funeral home. Bergeson observed the white van exiting from the CVS parking lot and followed it, turning on his vehicle's overhead lights and police siren. The defendant proceeded up Wall Street while Bergeson was directly behind him with the overhead lights and police siren turned on. The defendant turned onto Summer Street, then Redden Avenue, then Colman Street and into his residence. Bergeson parked his cruiser at the

front of the residence and proceeded to the rear of the residence on foot. Bergeson observed the defendant and his daughter in the van. He ordered the defendant to exit the van and informed him that he was under arrest. At some point, the defendant began to exit the van, and Bergeson pointed his Taser at the defendant. The defendant returned to the interior of the van, shutting and locking the door. The defendant placed a telephone call to the police dispatcher, requesting to speak to either a captain or lieutenant, and claiming that he and his daughter were being threatened by the police. The dispatcher informed the defendant that Bergeson was acting lieutenant. The defendant then exited the van and was taken into custody without further incident.

In an amended substitute information, the defendant was charged with risk of injury to a child in violation of General Statutes § 53-21 (a) (1), increasing speed in an attempt to escape or elude a police officer in violation of § 14-223 (b) and two counts of interfering with an officer in violation of § 53a-167a. Following the presentation of the state's case, the defendant moved for a judgment of acquittal as to all four counts. Count one of the amended substitute information alleged that the defendant had obstructed and hindered Nott in the performance of her duties in the CVS parking lot "by repeatedly yelling at the parties to a motor vehicle crash and interfering with . . . Nott's investigation of the accident in which the defendant was not involved . . . ." The court granted the defendant's motion for a judgment of acquittal with respect to count one. Referring to our Supreme Court's decision in *State* v. *Williams*, 205 Conn. 456, 473, 534 A.2d 230 (1987),[1] the court ruled: "When, in fact, one is dealing with [a] first amendment question and the right of expression, the interfering statute is restricted to what is known as fighting words, either words directed at the officer or to those in the area such that they are—their very nature would require or ordinarily cause one to react in a negative fashion, in fact, one of violence. That is, clearly, not what happened here. As for the verbal exchange, it is correct that the verbal exchange was not even with [Nott], according to the evidence that has been presented. As far as the claim that the verbal exchange interfered with [Nott's] ability, I see no evidence of that. I see no specific testimony that would indicate that the conversation between the witness and the defendant interfered, prevented [Nott], or even delayed [Nott] in any way. There may have been a subsequent argument with [Nott]; but, again, citing *Williams*, that is not sufficient for a charge of interfering with a police officer." The court denied the remainder of the defendant's motion.

Following the conclusion of the trial, the jury found the defendant not guilty of risk of injury, guilty of attempting to escape or elude a police officer and guilty of interfering with an officer. The interfering with an

officer count was based on the defendant's locking the van door and preventing Bergeson from arresting him following the police pursuit. The court denied the defendant's postverdict motions and rendered judgment in accordance with the jury's verdict. The court sentenced the defendant to one year of incarceration, execution suspended, two years of probation and a $500 fine. This appeal followed.

I

The defendant first claims that the evidence was insufficient to support his conviction of attempting to escape or elude a police officer. Specifically, he argues that a video of the pursuit, as captured by a dashboard camera in Bergeson's vehicle, "unequivocally demonstrated that the defendant never increased his speed or tried to elude Bergeson."[2] The state counters that the video does not conclusively establish the facts so as to have preclusive effect over the testimony of the witnesses. We agree with the state.

We begin with our standard of review. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . We note that the [finder of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [finder of fact] to conclude that a basic fact or an inferred fact is true, the [finder of fact] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"When there is conflicting evidence . . . it is the exclusive province of the . . . trier of fact, to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask,

instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Citation omitted; internal quotation marks omitted.) *State* v. *Little*, 127 Conn. App. 336, 339–40, 14 A.3d 1036, cert. denied, 302 Conn. 928, 28 A.3d 343 (2011); see also *State* v. *Testa*, 123 Conn. App. 764, 767–68, 3 A.3d 142, cert. denied, 298 Conn. 934, 10 A.3d 518 (2010).

"Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . [An] appellate court's first task, in responding to a claim of evidentiary insufficiency, is to apply the traditional scope of review to the evidence. That requires that . . . we view all of the evidence, and the reasonable inferences drawable therefrom, in favor of the [trier's] verdict. . . . We note that a claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Butler*, 296 Conn. 62, 77, 993 A.2d 970 (2010).

The state set forth the following in its second amended substitute information: "And said [prosecutor] further accuses [the defendant] of [violating § 14-223 (b)] and charges in the City of New London, on or about April 23, 2009, the [defendant] at Wall Street, did increase the speed of the motor vehicle he was driving in an attempt to escape or elude . . . Bergeson of the New London Police Department when said police officer activated his emergency lights and sirens indicating to the [defendant] to stop, but instead the [defendant] increased his speed . . . ."

We now turn to the relevant text of § 14-223 (b): "No person operating a motor vehicle, when signaled to stop by an officer in a police vehicle using an audible signal device or flashing or revolving lights, shall increase the speed of the motor vehicle in an attempt to escape or elude such police officer. Any person who violates this subsection shall be guilty of a class A misdemeanor . . . ." This court has identified the elements necessary to support a conviction under this statute. Specifically, we stated that a conviction under this statute "requires proof that an officer using an audible signal or flashing or revolving lights signaled the operator to stop and that the operator increased his vehicle's speed in an attempt to escape." *State* v. *Browne*, 84 Conn. App. 351, 370, 854 A.2d 13, cert. denied, 271 Conn. 931, 859 A.2d 930 (2004). In *Browne*, we further noted that "[§] 14-223 requires only the general intent to escape or to elude a police officer signaling the operator of a motor vehicle to stop. General intent is the term used to define

the requisite mens rea for a crime that has no stated mens rea; the term refers to whether a defendant intended deliberate, conscious or purposeful action, as opposed to causing a prohibited result through accident, mistake, carelessness, or absent-mindedness. Where a particular crime requires only a showing of general intent, the prosecution need not establish that the accused intended the precise harm or precise result which resulted from his acts." (Internal quotation marks omitted.) Id., 372.

The state presented the following evidence to prove that the defendant violated § 14-223 (b). At the time of trial, Bergeson was a police lieutenant who had been employed by the New London Police Department for fourteen years. Bergeson testified that while in pursuit of the defendant's van with his overhead lights and siren turned on, he observed the defendant accelerate up Wall Street. Additionally, the jury watched the video of the incident. The video shows the defendant's van take a sudden left turn, without signaling or braking, onto Wall Street. The van is out of frame of the video camera for approximately five seconds. The van continues up Wall Street for approximately eleven seconds before the defendant approaches a stop sign and applies the brakes. The defendant does not appear to come to a complete stop before turning right onto Summer Street.

The defendant does not claim that he was not the operator of the van, that Bergeson was not a police officer or that Bergeson did not use his overhead flashing or revolving lights and sirens as a signal for the defendant to stop. His claim on appeal is limited to whether he increased his speed while driving on Wall Street with the intent to escape or elude Bergeson. Specifically, the defendant argues that the video of the incident conclusively shows that these two elements were not proven by the state beyond a reasonable doubt. In support, he relies on *Scott* v. *Harris*, 550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007), and *State* v. *Santos*, 267 Conn. 495, 838 A.2d 981 (2004).

In *Harris*, the issue before the United States Supreme Court was "whether a law enforcement official can, consistent with the Fourth Amendment, attempt to stop a fleeing motorist from continuing his public-endangering flight by ramming the motorist's car from behind." *Scott* v. *Harris*, supra, 550 U.S. 374. The respondent was observed travelling seventy-three miles per hour, exceeding the posted speed limit by eighteen miles per hour. Id. A police chase ensued, and Georgia Deputy Timothy Scott, the petitioner, requested and received permission to perform a maneuver that would cause the respondent's vehicle to spin to a stop. Id., 375. The petitioner applied a push bumper to the rear of the respondent's vehicle and, as a result, the respondent lost control of his vehicle, which went down an embankment. He was rendered a quadriplegic. Id.

The respondent filed a lawsuit alleging that there had been excessive force used that resulted in an unreasonable seizure in violation of the fourth amendment to the United States constitution. Id., 375–76. The petitioner filed a motion for summary judgment on the basis of qualified immunity. Id., 376. The respondent's version of the events differed significantly from that of the petitioner. Id., 378. As a result, both the District Court and the United States Court of Appeals for the Eleventh Circuit determined that the petitioner was not entitled to summary judgment. Id., 376. The petitioner successfully petitioned for certification to appeal to the United States Supreme Court. Id.

The United States Supreme Court began its analysis by noting that, generally, the District Court is required to view the facts in the light most favorable to the nonmoving party, there, the respondent. Id., 378. "There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question. There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened. The videotape quite clearly contradicts the version of the story told by respondent . . . ." Id. The Supreme Court then described in detail the chase as depicted on the videotape, and characterized it as "a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." Id., 380.

The videotape in *Harris* conclusively established the facts with respect to whether the respondent's driving endangered human life, notwithstanding the general rule of viewing a disputed factual record in favor of the nonmoving party. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. . . . Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." Id., 380–81. The United States Supreme Court reversed the decision of the Court of Appeals, concluding that the petitioner was entitled to summary judgment. Id., 386.

In *Santos*, our Supreme Court was faced with the question of whether the trial court properly had denied the defendant's motion to suppress narcotics following a warrantless patdown search for weapons. *State* v. *Santos*, supra, 267 Conn. 496. The defendant filed a motion to suppress, and the court conducted a hearing. It found that two state police troopers were patrolling athletic fields in Windham at night where they came upon the defendant and three other individuals. Id.,

498–99. One of the troopers testified that, as he approached, the men started pacing back and forth and seemed visibly nervous. Id., 499. After further questioning, the trooper requested the men to stand in front of his cruiser, which they did. Id., 500. One of the individuals then started to move to the driver's side of the vehicle. Id. Out of concern for his safety, the trooper instructed the four men to remain still and submit to a patdown search. Id. When the trooper patted down the defendant, he discovered a clear plastic bag containing a white powdery substance and arrested the defendant for possession of narcotics. Id., 500–501. Following the conclusion of the hearing, the trial court denied the defendant's motion to suppress. Id., 501.

On appeal, the defendant argued that the court improperly found that he and the other individuals were perspiring and pacing back and forth. Id., 502–503. As a result, he claimed, the court improperly determined that the trooper had a reasonable and articulable suspicion for the patdown search. Id., 503. Our Supreme Court concluded that the court's finding that the defendant and his companions were perspiring was clearly erroneous because there was no testimony as to that fact and the videotape of the event provided no support for such a finding. Id., 506. Additionally, the videotape did not support the trooper's testimony that the defendant and the others were pacing back and forth. Id. To the contrary, "[t]he videotape depicts the defendant and his friends standing at the rear of their car, occasionally shifting their weight from one foot to the other while standing in the glare of the spotlight, answering [the trooper's] questions. That movement cannot properly be characterized as pacing back and forth." (Internal quotation marks omitted.) Id. As a result, our Supreme Court concluded that the trial court should have granted the defendant's motion to suppress. Id., 511.

Guided by these cases and having reviewed the relevant testimony and the video of Bergeson's pursuit of the defendant, we conclude that sufficient evidence exists to support the jury's finding of guilt with respect to the violation of § 14-223 (b). The factor that distinguishes the present case from *Harris* and *Santos* is that the video does not conclusively establish the underlying facts. Specifically, the video does not undisputedly indicate that the defendant was not accelerating up Wall Street or that he lacked the intent to elude or escape Bergeson. The video shows that the defendant made an abrupt left turn onto Wall Street, without signaling. The jury could have concluded that he accelerated at that point. Additionally, the video does not conclusively establish that the defendant did not accelerate while driving on Wall Street. The jury was free to accept the testimony of Bergeson, an experienced member of the New London Police Department, that the defendant was accelerating while travelling on Wall Street.[3] See, e.g., *State* v. *Hoover*, 54 Conn. App. 773, 777, 738 A.2d 685

(1999) ("It is the function of the jury to consider the evidence and to judge the credibility of witnesses. . . . The jury is free to accept or reject all or part of a witness' testimony." [Citation omitted; internal quotation marks omitted.]).

We now turn to the element of whether the defendant intended to escape or elude Bergeson. "As this court frequently has observed, [i]ntent is a mental process, and absent an outright declaration of intent, must be proved through inferences drawn from the actions of an individual, i.e., by circumstantial evidence. . . . Furthermore, any inference drawn must be [rational] and founded upon the evidence." (Internal quotation marks omitted.) *State* v. *Colon*, 117 Conn. App. 150, 157, 978 A.2d 99 (2009); see also *State* v. *Papandrea*, 120 Conn. App. 224, 230, 991 A.2d 617 (2010), aff'd, 302 Conn. 340, 26 A.3d 75 (2011).

"It is well settled . . . that the question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . *Intent may be and usually is inferred from conduct. . . . [W]hether such an inference should be drawn is properly a question for the jury to decide. . . . Intent may be inferred from circumstantial evidence such as the events leading to and immediately following the incident, and the jury may infer that the defendant intended the natural consequences of his actions.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Papandrea*, supra, 120 Conn. App. 230.

The defendant argues that the video demonstrates that he brought the van to a stop at intersections and used turn signals, and therefore established that he lacked the intent to escape or elude Bergeson. We are not persuaded. First, the video does not show that the defendant used his brakes or a turn signal as he made the left turn onto Wall Street. The video does show Bergeson's police cruiser with its overhead flashing lights and sirens turned on behind the defendant's van and the defendant not pulling over. Further, Nott testified that, while at the CVS parking lot, she made the defendant aware of the fact that she was requesting assistance. She stated that the defendant "heard the response, ran to the car, got in the car and sped out— ran to the van, got into the van and left the parking lot." *Harris* and *Santos* are distinguishable because the video in this case does not conclusively establish the facts underlying the charge of § 14-223 (b). The evidence, including the video and the testimony of the witnesses, provided the necessary support for the jury's

finding that the defendant violated § 14-223 (b).

## II

The defendant next claims that § 14-223 (b) is unconstitutionally vague as applied to the facts of this case. Specifically, he argues that because § 14-223 (b) does not contain an element that a police officer, when initiating motor vehicle stops, must be acting lawfully and within the scope of his or her duties, it authorizes or even encourages arbitrary and discriminatory enforcement. We are not persuaded.

As a preliminary matter, we consider whether this claim has been preserved for appellate review. On April 16, 2010, the defendant filed a motion to dismiss the charges of two counts of interfering with the police in violation of § 53a-167a and one count of risk of injury to a child in violation of § 53-21. He alleged that as applied to the facts set forth in the operative information, § 53a-167a was unconstitutionally broad and vague and that § 53-21 was unconstitutionally vague. On April 12, 2011, prior to the start of the trial, the parties discussed the defendant's motion with the court. In neither the motion nor this discussion did the defendant argue that § 14-223 (b) was unconstitutionally vague as applied to the facts of this case. Further, this specific claim was not raised in the defendant's postverdict motion for a new trial. We conclude, therefore, that the defendant failed to preserve this claim in the trial court proceedings.

The defendant argues, in the alternative, that his claim is reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). In *Golding*, our Supreme Court "held that a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Internal quotation marks omitted.) *State* v. *Burton*, 258 Conn. 153, 157–58, 778 A.2d 955 (2001). The state does not dispute that the record is adequate to review the claim and that the claim is of constitutional magnitude. We agree that the first two prongs of *Golding* are satisfied and, therefore, we will proceed to review the defendant's claim. Id., 158; *State* v. *Tozier*, 136 Conn. App. 731, 746, 46 A.3d 960, cert. denied, 307 Conn. 925, 55 A.3d 567 (2012); see also *State* v. *Lavigne*, 307 Conn. 592, 599, 57 A.3d 332 (2012) ("[t]he first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a

determination of whether the defendant may prevail" [internal quotation marks omitted]). After reviewing the merits of the defendant's claim, we conclude that he fails to satisfy the third *Golding* prong.

We begin our analysis with the standard of review and the relevant legal principles with respect to a void for vagueness challenge. "We begin by noting that determining whether a [statute] is unconstitutionally vague presents a question of law over which our review is de novo. . . . [A] penal statute [must] define [a] criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. . . . [This concept] embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. . . . [T]he [most] important aspect of the vagueness doctrine is not actual notice . . . but . . . the requirement that a legislature establish minimal guidelines to govern law enforcement. . . . Thus, [i]n order to surmount a vagueness challenge, a statute [must] afford a person of ordinary intelligence a reasonable opportunity to know what is permitted or prohibited . . . and must not impermissibly [delegate] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. . . . Finally, [i]f the meaning of a statute can be fairly ascertained [the] statute will not be void for vagueness . . . for [i]n most English words and phrases there lurk uncertainties. . . . [T]he statute must contain some core meaning within which the defendant's actions clearly fall. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning. . . .

"For statutes that do not implicate the especially sensitive concerns embodied in the first amendment, we determine the constitutionality of a statute under attack for vagueness by considering its applicability to the particular facts at issue. . . . [T]o prevail on his claim, the defendant must demonstrate beyond a reasonable doubt that the statute, as applied to him, deprived him of adequate notice of what conduct the statute proscribed or that he fell victim to arbitrary and discriminatory enforcement." (Citation omitted; internal quotation marks omitted.) *State* v. *Stephens*, 301 Conn. 791, 800–802, 22 A.3d 1262 (2011); *State* v. *Winot*, 294 Conn. 753, 758–60, 988 A.2d 188 (2010). Put another way, "[o]ur fundamental inquiry is whether a person of ordinary intelligence would comprehend that the defendant's acts were prohibited . . . ." (Internal quotation marks omitted.) *State* v. *Elliott*, 127 Conn. App. 464, 471, 14 A.3d 439, cert. denied, 301 Conn. 916, 21 A.3d 462 (2011). We also "restate the common-law rule

that everyone is presumed to know the law and that ignorance of the law excuses no one from criminal sanction." *State* v. *Knybel,* 281 Conn. 707, 713, 916 A.2d 816 (2007). Finally, we note that "[a] statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity." (Internal quotation marks omitted.) *State* v. *Ward,* 306 Conn. 718, 742, 51 A.3d 970 (2012); see also *State* v. *Springmann,* 69 Conn. App. 400, 407, 794 A.2d 1071 (to prevail in challenge to constitutionality of statute, defendant must demonstrate beyond reasonable doubt that statute, as applied, deprived him or her of adequate notice or that he or she fell victim to arbitrary and discriminatory enforcement), cert. denied, 260 Conn. 934, 802 A.2d 89 (2002).

The defendant's vagueness argument may be summarized as follows. First, citizens of Connecticut enjoy a common-law right to ignore unlawful commands by the police. The trial court determined that the defendant had engaged in constitutionally protected speech with respect to his interaction with Nott at the CVS parking lot. Nott provided Bergeson with no information that would justify his decision to pull the defendant's vehicle over. Therefore, Nott and Bergeson lacked a legitimate basis to stop the defendant after he left the CVS parking lot, and their behavior amounted to arbitrary police enforcement. Thus, the defendant argues: "Absent a lawful basis to restrict [the defendant's] freedom *ab initio,* Bergeson acted unlawfully, and [§ 14-223 (b)] cannot be enforced against [the defendant] without violating the common law." (Emphasis in original.) In conclusion, the defendant states that in order to survive his vagueness challenge, the court should have instructed the jury that § 14-223 (b) applies only in circumstances where police officers are acting lawfully or within the scope of their duties. We read the defendant's argument to mean that had the court interpreted § 14-223 (b) to require that such an instruction be given, the risk of arbitrary and discriminatory enforcement would have been eliminated.

The state counters that a person of ordinary intelligence would understand that, under the plain terms of § 14-223 (b), accelerating away from a signaling police officer with the intent to escape or elude violates the statute. It also argues that there is no risk of arbitrary and discriminatory enforcement because the plain terms of § 14-223 (b) provide sufficient guidance as to the behavior that is prohibited. Additionally, even if such minimum guidelines were absent, the statute has a core meaning within which the defendant's conduct fell. The state further contends that the court's dismissal of the interference count relating to his conduct in the CVS parking lot means only that the state failed to produce sufficient evidence to sustain a conviction, not that the officers were acting illegally. Finally, the state maintains that even if the determination to arrest the

defendant was illegal, he had no right to engage in criminal conduct to avoid the arrest.

The defendant does not appear to address the first prong of a constitutional vagueness claim, that is, the right to fair warning of the effect of a governing statute. We therefore focus our analysis on the second prong, that is, the guarantee against standardless law enforcement. The question is whether the statute's language impermissibly delegated a basic policy matter for resolution by police, judges and juries on an ad hoc and subjective basis, particularly in light of the common-law right of Connecticut citizens to refuse to obey an unlawful police command to stop. Put another way, "a legislature [must] establish minimal guidelines to govern law enforcement." (Internal quotation marks omitted.) *State* v. *Winot*, supra, 294 Conn. 760.

Our Supreme Court has instructed that "[a]s a practical matter, a court analyzing an as-applied vagueness challenge may determine that the statute generally provides sufficient guidance to eliminate the threat of arbitrary enforcement without analyzing more specifically whether the particular enforcement was guided by adequate standards. In fact, it is the better (and perhaps more logical) practice to determine first whether the statute provides such general guidance, given that the [United States] Supreme Court has indicated that the more important aspect of the vagueness doctrine is the requirement that a legislature establish minimal guidelines to govern law enforcement. . . . If a court determines that a statute provides sufficient guidelines to eliminate generally the risk of arbitrary enforcement, that finding concludes the inquiry.

"[When] a statute provides insufficient general guidance, an as-applied vagueness challenge may nonetheless fail if the statute's meaning has a clear core. . . . In that case the inquiry will involve determining whether the conduct at issue falls so squarely in the core of what is prohibited by the law that there is no substantial concern about arbitrary enforcement because no reasonable enforcing officer could doubt the law's application in the circumstances." (Internal quotation marks omitted.) *State* v. *Stephens*, supra, 301 Conn. 805–806.

The preceding explanation is necessary to put the defendant's argument into the proper context. We need not proceed with the analytical framework, however, due to a fatal flaw in the defendant's analysis. He assumes that the trial court, by granting his motion for a judgment of acquittal with respect to the interfering with a police officer count, found that the officers were acting outside the scope of their police duties, i.e., illegally and on a personal frolic. The court made no such finding, either explicit or implicit. Rather, the court determined that the state had failed to produce sufficient evidence to support a conviction with respect to the count of interfering with a police officer at the CVS

parking lot.

This court, citing federal law, has stated that the issue of whether a police officer is acting within the scope of his or her official duties is a factual question. *State* v. *Privitera*, 1 Conn. App. 709, 722, 476 A.2d 605 (1984). In *State* v. *Davis*, 261 Conn. 553, 572, 804 A.2d 781 (2002), our Supreme Court also indicated that the question of whether a police officer was in the performance of his or her duties presented an issue for the fact finder.[4] In the present case, the court granted the defendant's motion for a judgment of acquittal without finding that the officers were acting outside the scope of their duties. Therefore, the entire foundation of the defendant's as applied vagueness argument erodes. Specifically, the court did not find that the defendant was issued an illegal police command. There was no determination that the officers lacked probable cause to arrest the defendant. Thus, there were no findings to support a conclusion that the efforts to arrest the defendant for his conduct in the CVS parking lot were illegal. As a result, the defendant's claim fails under the third prong of *Golding*.

### III

The defendant next claims that the court improperly failed to charge the jury on two theories of defense. Specifically, he argues that he was entitled to have the jury charged on the defenses of entrapment and the exercise of his rights under the first amendment. The state counters that these requested instructions were not relevant to the issues before the jury, and that, therefore, the court properly declined to give them. We agree with the state.

The defendant submitted written jury instructions to the court.[5] The defendant requested the court to instruct the jury on the defense of entrapment, as set forth in General Statutes § 53a-15. He also requested that the court instruct the jury with respect to the first amendment to the United States constitution. Specifically, he filed a request to charge the jury as follows: "Moreover, the constitutional right to free speech extends to nearly all words directed toward a police officer, even where those words are angry, annoying or offensive, as long as they don't constitute a true threat to commit violence. Asking someone, 'Is this officer giving you a ticket,' offering opinions about the integrity of the officer, or inquiring whether the officer made a threat, are not crimes. They are protected forms of expression. Asking for a supervisor, such as a captain, is also a protected form of expression. Insolence and rudeness are not crimes, and enforcing better standards of social conduct is not the business of police officers, or the courts. Due to their training and experience police officers are expected to be more thick-skinned than ordinary citizens, and therefore the first amendment protects a significant amount of verbal criticism directed at police

officers, that might be inappropriate in other contexts." The defendant also requested an instruction that taking a photograph of a police officer is protected by the first amendment.

The court discussed the jury charge with counsel on the record. It stated that it would not charge the jury as to the first amendment or the defense of entrapment.[6] Defense counsel then stated that he requested the first amendment charge because "there [was] testimony that, that—the reason that the police acted the way they acted was because of things that [the defendant] said in the officer's presence."[7] Defense counsel further elaborated that the officers were not in the performance of their duties but rather were engaged in a personal frolic; therefore, the efforts to pull the defendant over and issue him a ticket were based on a personal grudge. He also argued that acting in the performance of duty was a necessary implied element of § 14-223 (b). Turning to the issue of entrapment, defense counsel argued that there was evidence that the police provoked the defendant to actions that constituted an offense. He also contended that the officers were not acting in the performance of their duty when they provoked the defendant.

We begin our analysis with the defendant's claim that the court improperly refused to charge the jury on the defense of entrapment. Our Supreme Court recently addressed this issue in *State* v. *Golodner*, 305 Conn. 330, 46 A.3d 71 (2012). "Our review of the defendant's claim requires that we examine the [trial] court's entire charge to determine whether it is reasonably possible that the jury could have been misled by the omission of the requested instruction. . . . While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . The defendant's right as a matter of law to a theory of defense instruction exists, however, only when there is evidence adduced indicating the availability of the defense. The court . . . has a duty not to submit to the jury, in its charge, any issue upon which the evidence would not reasonably support a finding. . . .

"Entrapment is a legally recognized defense in this state. . . . See General Statutes § 53a-15. Until something in the evidence indicates the contrary, the court may presume the defendant intended the prohibited bodily movements that constitute the offense and that he has acted under no duress, unlawful inducement in the nature of entrapment, or lack of requisite mental capacity. . . . In reviewing the defendant's claim that he was entitled to instructions on an affirmative defense, we look at the evidence in a light most favorable to his claim. . . . When a defendant has produced evidence supporting a legally recognized defense, the

trial court's refusal to provide an instruction with respect to that defense constitutes a denial of due process. . . .

"[O]nly when evidence indicating the availability of [a] legally recognized [defense] is placed before a jury is a defendant entitled as a matter of law to a theory of defense instruction. . . . [A] defendant is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible . . . . A fundamental element of due process is the right of a defendant charged with a crime to establish a defense. . . .

"Where the legislature has created a legally recognized defense, in this case entrapment, this fundamental constitutional right includes a proper jury instruction on the elements of the defense of entrapment so that the jury may ascertain whether the state has met its burden of disproving it beyond a reasonable doubt. . . .

"General Statutes § 53a-15 provides in relevant part: [i]t shall be a defense that the defendant engaged in the proscribed conduct because he was induced to do so by a public servant, or by a person acting in cooperation with a public servant, for the purpose of institution of criminal prosecution against the defendant, and that the defendant did not contemplate and would not otherwise have engaged in such conduct. The subjective test of entrapment focuses on the disposition of the defendant to commit the crime for which he or she is accused. . . . Under [the alternative objective test] standard, entrapment exists if the government conduct was such that a reasonable person would have been induced to commit the crime. . . . The Connecticut legislature has chosen to adopt the subjective defense of entrapment. . . . This statute codifies prior Connecticut case law . . . . To warrant an instruction on entrapment, the defendant must produce evidence of both inducement and his own lack of criminal disposition. . . . Where, as here, an accused requests an instruction on a defense such as entrapment, he may obtain such a charge by adducing evidence . . . sufficient . . . for a rational juror to find that all the elements of the defense are established by a preponderance of the evidence." (Citations omitted; internal quotation marks omitted.) Id., 351–53; see generally *State* v. *McNally*, 173 Conn. 197, 200–202, 377 A.2d 286 (1977); *State* v. *Marquardt*, 139 Conn. 1, 4–8, 89 A.2d 219 (1952); see also *State* v. *Wilder*, 128 Conn. App. 750, 755, 17 A.3d 1116 ("[i]t is well established that where there is no evidence that the defendant either was induced by the police to commit a crime in which he would not have engaged except for such inducement or that he admitted to committing a crime, a charge on entrapment is not required"), cert. denied, 301 Conn. 934, 23 A.3d 730 (2011).

## A

We first consider the defendant's entrapment argument. On appeal, the defendant claims that his actions were induced by and resulted from the provocation from the members of the New London Police Department. Furthermore, he contends that there was "overwhelming" evidence that his actions were induced and provoked by the police. Specifically, the defendant points to the following: (1) Nott's request to have the defendant arrested for his conduct at the CVS parking lot was unlawful; (2) Bergeson, as a supervisor, should have known that there was no basis to stop the defendant; (3) Bergeson falsified a police report detailing the events of the police chase; (4) Nott and Bergeson knew that they were defendants in a civil lawsuit filed by the defendant; and (5) Bergeson's use of his Taser provoked or induced the defendant to reenter his van after he had driven to his house.

We have noted that "under our state decisional law, [e]vidence of unlawful inducement may be found where the police . . . appeal to the [accused's] sympathy or friendship, or where they *repeatedly* or *persistently* solicit the [accused] to commit the crimes." (Emphasis in original; internal quotation marks omitted.) *State* v. *Wilder*, supra, 128 Conn. App. 758. The defendant has failed to establish that the evidence in this case met this standard and, thus, required an instruction on entrapment. There is no evidence that Nott, Bergeson, or any other member of the New London Police Department repeatedly or persistently solicited the defendant to drive away from the CVS parking lot and to refuse to pull his vehicle over when signaled to do so. Additionally, Bergeson's pointing his Taser at the defendant, after he had engaged in a pursuit and the defendant refused to obey his direction to pull over, did not amount to a repeated and persistent inducement to interfere with Bergeson's attempt to place the defendant under arrest. There was no showing by the defendant that, but for the actions of the police, he would not have engaged in such conduct. See *State* v. *Golodner*, supra, 305 Conn. 354. Additionally, there was no evidence of lack of criminal disposition. See id., 353. We conclude, therefore, that the court properly declined to instruct the jury on the defense of entrapment.

## B

We now turn to the defendant's claim that he was entitled to an instruction on the issue of constitutionally protected speech. "[A] request to charge which is relevant to the issues of the case and which is an accurate statement of the law must be given. . . . [W]hen reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual

component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citation omitted; internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 234–35, 733 A.2d 156 (1999).

This argument is based upon the claim that the officers were found to have engaged in a personal frolic. We have rejected that as contrary to the action of the trial court. See part II of this opinion. Furthermore, we agree with the state that the court was not required to give the jury the requested first amendment instruction, as it was not relevant to the remaining charges. See *State* v. *Vilchel*, 112 Conn. App. 411, 434, 963 A.2d 658, cert. denied, 291 Conn. 907, 969 A.2d 173 (2009). We therefore reject these claims of instructional error.

IV

The defendant's final claim is that he was deprived of the right to a fair trial as a result of prosecutorial impropriety.[8] Specifically, he argues that the prosecutor made five improper comments to the jury during closing argument. The state concedes that two of the five statements were improper. The state argues, however, that the defendant was not deprived of his right to a fair trial, despite the two improper statements. We conclude that the defendant was not deprived of the right to a fair trial.

We begin by setting forth the relevant law regarding prosecutorial impropriety. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. E.g., *State* v. *Stevenson*, 269 Conn. 563, 572, 849 A.2d 626 (2004). The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[T]he touchstone of due process analysis in cases of alleged [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial . . . we must view the prosecutor's [actions]

in the context of the entire trial. . . .

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. . . .

"Once prosecutorial impropriety has been alleged, however, it is unnecessary for a defendant to seek to prevail under *State* v. *Golding*, [supra, 213 Conn. 239–40], and it is unnecessary for an appellate court to review the defendant's claim under *Golding*. . . . The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). As [the court] stated in that case: In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 32–34, 917 A.2d 978 (2007). Guided by these principles, we address each of the defendant's claims of impropriety in turn.[9]

### A

The defendant first claims that the prosecutor improperly offered his personal opinion on the issue of the defendant's guilt. During the beginning of his rebuttal, the prosecutor argued to the jury: "And we all know the burden is on me, on the state, to prove this case beyond a reasonable doubt. Okay. Let me tell you

why. Let me tell you why I think this case warrants conviction." At this point, defense counsel objected, but the court overruled the objection. The prosecutor then proceeded to review the evidence against the defendant. At the conclusion of the state's rebuttal argument, the prosecutor stated: "Again, the burden is on me. And rightly, it should be. If I'm going to convict someone, I better well have a good case. And I think we do." Defense counsel again objected, and the court, agreeing with the defendant, ordered that the personal opinion of the prosecutor be stricken.

The defendant argues that, with respect to these two statements, the prosecutor improperly offered his personal opinion on the issue of the defendant's guilt. The state counters that the statement made by the prosecutor at the beginning of his rebuttal argument did not amount to prosecutorial impropriety. It concedes, however, that the latter statement made by the prosecutor was improper; nevertheless, it argues that the defendant was not deprived of a fair trial.

1

We begin by determining whether the prosecutor's statement made at the outset of his rebuttal argument amounted to an improper statement of his personal opinion as to the defendant's guilt or was a rhetorical device to walk the jury through the evidence, as argued by the state.

"In determining whether [prosecutorial impropriety] has occurred [in the course of closing arguments], the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) *State v. Boutilier*, 133 Conn. App. 493, 510, 36 A.3d 282, cert. denied, 304 Conn. 914, 40 A.3d 785 (2012).

We agree with the state that the prosecutor's comment served as an introduction to his review and summary of the evidence against the defendant and was not improper.[10] "We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw infer-

ences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like." (Internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 465–66, 832 A.2d 626 (2003); see also *State* v. *Houle*, 105 Conn. App. 813, 823, 940 A.2d 836 (2008) (where prosecutor used "I," it was evident he was encouraging jury to draw reasonable inferences from evidence).

2

We next turn to the prosecutor's statement expressing his personal belief that the state had a strong case. As noted previously, the state concedes that this statement was improper.[11] We agree. Accordingly, we use the *Williams* factors to determine if the defendant was deprived of his right to a fair trial as a result of this statement. We conclude that he was not.

The prosecutor's comment was not invited by defense counsel, and upon objection was stricken by the court. The court also immediately instructed the jury that the personal opinion of the prosecutor was not part of the argument. In addition to this curative measure, the court instructed the members of the jury that they were the sole judges of the facts, that they were to determine the facts from the evidence and not the argument of counsel and that they were not to consider matters stricken from the record. The jury is presumed to have followed the court's instructions. *State* v. *Payne*, 303 Conn. 538, 568, 34 A.3d 370 (2012). The improper comment was not severe, as it followed the prosecutor's summary of the evidence. This improper comment was a single instance and, therefore, was not frequent. Finally, although we would not describe the state's case as overwhelming, we disagree with the defendant's assertion that the state had a weak case. There was more than sufficient evidence presented that supported the jury's verdict. For all of these reasons, we conclude that the defendant was not deprived of the right to a fair trial.

B

The defendant next contends that the prosecutor's arguments violated the prohibition against "golden rule" arguments in two instances. "[A] golden rule argument is one that urges jurors to put themselves in a particular party's place . . . or into a particular party's shoes. . . . Such arguments are improper because they encourage the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence. . . . They have also been equated to a request for sympathy. . . . The danger of these types of arguments lies in their [tendency]

to pressure the jury to decide the issue of guilt or innocence on considerations apart from the evidence of the defendant's culpability. . . . [A] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Citations omitted; internal quotation marks omitted.) *State* v. *Ovechka*, 118 Conn. App. 733, 745, 984 A.2d 796, cert. denied, 295 Conn. 905, 989 A.2d 120 (2010). Put another way, "[t]he animating principle behind the prohibition on golden rule arguments is that jurors should be encouraged to decide cases on the basis of the facts as they find them, and reasonable inferences drawn from those facts, rather than by any incitement to act out of passion or sympathy for or against any party. . . . Although we recognize that this danger is most acute when the prosecutor asks the jurors to put themselves in the position of the victim rather than the defendant or another witness . . . we conclude that the principle barring the use of such arguments is the same regardless of which individual is the subject of the prosecutor's emotional appeal." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 57–58, 975 A.2d 660 (2009).

During his rebuttal closing argument, the prosecutor stated: "And then there's . . . the discussion about . . . Bergeson taking out his Taser. Well, you know . . . Bergeson just chased this individual, you know, it might've [been] for a minute, but he doesn't know what his state, the defendant's state of mind is. He doesn't know what he's going to do. He has a right to protect himself. *Put yourself in the policeman's shoes. What would you do?*

"And yes, there's a civil rights suit. You know, granted, it came out. But doesn't . . . Bergeson have the right to at least defend himself. He doesn't know what the defendant's state of mind is on this particular day.

"Now, getting back to the engaging police in pursuit, how many times have—when you've been driving down the road, have you ever seen the flashing red lights in the rearview mirror. . . . *What would you do? What is your normal reaction when you see the flashing red lights in the rearview mirror?*"[12] (Emphasis added.) The defendant argues that the two comments, which we have emphasized, violated the prohibition against golden rule arguments.

1

After reviewing the record, we are satisfied that the comment made by the prosecutor asking the jurors what their normal reaction was when they saw flashing red lights in their vehicles' rearview mirrors did not constitute an improper attempt to appeal to the emotions of the jurors, but rather was an appropriate request for them to draw an inference from the evidence. See *State* v. *Bell*, 283 Conn. 748, 769–70, 931 A.2d 198 (2007); *State* v. *Ovechka*, supra, 118 Conn. App. 746. Specifically, that comment encouraged the jurors to draw inferences from the evidence as to the defendant's action in not pulling over when Bergeson was signaling that amounted to a violation of § 14-223 (b). We conclude, therefore, that the prosecutor's comment did not violate the prohibition against golden rule arguments.

2

With respect to the prosecutor's comment inviting the members of the jury to place themselves in the shoes of a police officer and asking what they would do in the present situation, we conclude that the comment was improper because it violated the prohibition against golden rule arguments. Specifically, it encouraged the members of the jury to decide the case not on the basis of the facts of the case, but rather on their emotions and passions. Put another way, the prosecutor's comment inviting the jurors to place themselves in the shoes of a police officer was tantamount to a request for sympathy and a recognition of the challenging tasks facing police officers. Accordingly, we conclude that this comment was improper.

We now apply the *Williams* factors to determine whether this comment deprived the defendant of the right to a fair trial. We conclude that it did not.

Defense counsel stated during closing argument that Bergeson intended to Taser the defendant and reminded the jury of the defendant's heart condition and hypertension, and that the defendant's daughter was present during the encounter. He also stated: "Now, [the defendant] knows Bergeson. He's suing Bergeson. Imagine a guy who's got a personal beef against you being the one standing there with a dangerous instrument." In short, counsel provided the jury with the reasons for the defendant's actions. In response to that, the prosecutor provided the jury with the reasons for Bergeson's actions, including the threatened use of the Taser. The prosecutor's comment, therefore, was in response to the argument of defense counsel. We also conclude that this instance of impropriety was not severe, not frequent, and was not central to the critical issues of the case. See *State* v. *Fauci*, supra, 282 Conn. 32–34. Accordingly, the defendant was not deprived of his right to a fair trial as a result of this improper statement.

C

The defendant next contends that the prosecutor

improperly went outside the record and asserted his personal knowledge when he stated how he would have reacted in the defendant's situation. The state concedes that this statement was improper,[13] but argues that it did not deprive the defendant of his right to a fair trial. We agree with the state.

During his rebuttal closing argument, the prosecutor stated: "Now, getting back to the engaging police in pursuit, how many times have—when you've been driving down the road, have you ever seen the flashing red lights in the rearview mirror. *I'm a prosecutor, and I get a lump in my throat. I'm like—oh, God—what did I do. I'm checking my speedometer. I see if my headlights work, whatever. You know what I do? I pull over. It doesn't even matter whether I did something wrong or not. . . . I know what to do at that particular point.*" (Emphasis added.)

Defense counsel immediately objected and stated the basis for the objection as follows: "Putting—the prosecutor is not allowed to put his own personal experience into argument." The prosecutor then withdrew his comments about his personal experiences, and the court instructed the jury: "Withdrawn. All right, you may disregard that portion of the argument."

As a general matter, we note that "[a] prosecutor . . . may not . . . inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence. . . . A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record." (Citation omitted; internal quotation marks omitted.) *State* v. *Moore*, 293 Conn. 781, 809, 981 A.2d 1030 (2009), cert. denied, U.S. , 130 S. Ct. 3386, 177 L. Ed. 2d 306 (2010). This court has stated that it is improper for a prosecutor to invite the jury to consider the conduct of the defendant through the lens of the prosecutor's own life experiences. See *State* v. *Houle*, supra, 105 Conn. App. 825.

We therefore turn to the *Williams* factors to determine whether these comments violated the defendant's right to a fair trial. The comment was isolated, not central to a key issue of the case and the state presented a strong case. Indeed, there is no dispute that the defendant failed to pull over when signaled to do so by Bergeson. Additionally, following defense counsel's objection, the prosecutor immediately withdrew the comment, and the court instructed the jury to disregard it. As we previously noted, the court, during its charge, instructed the members of the jury not to consider matters that were not part of the evidence. For these reasons, we conclude that the defendant has failed to establish a deprivation of the right to a fair trial as a result of the prosecutorial impropriety.

The judgment is affirmed.

In this opinion BEACH, J., concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

[1] In *State* v. *Williams*, supra, 205 Conn. 473, our Supreme Court stated: "To avoid the risk of constitutional infirmity, we construe § 53a-167a to proscribe only physical conduct and fighting words that by their very utterance inflict injury or tend to incite an immediate breach of the peace." (Internal quotation marks omitted.)

[2] Video recordings from cameras located in various police vehicles, including those of Bergeson and Nott, were transferred to a disc and admitted into evidence as state's exhibit #1. On November 19, 2012, the parties filed a joint stipulation with this court indicating that attached the DVDs constituted four copies of the contents of the state's exhibit #1. This court has reviewed the contents of the video recordings. Further, we note that there is no claim that the video records have been altered in any way.

[3] We note that defense counsel conducted a rigorous cross-examination of Bergeson regarding the details of the pursuit, using not only the video, but also Bergeson's police report. Further, defense counsel highlighted certain inconsistencies and pointed out Bergeson's failure to follow policies regarding police pursuits.

[4] We acknowledge that the discussion regarding whether the police were in the performance of their duties in both *Privitera* and *Davis* was in the context of the interplay between General Statutes §§ 53a-23, 53a-167a (a) and 53a-167c (a). Nevertheless, we conclude that the question of whether Nott and Bergeson were in the performance of their official duties or acting illegally and on a personal frolic is a factual determination that was not made by the court, acting on the defendant's motion for a judgment of acquittal, in this case.

[5] The defendant preserved this claim by submitting a written request to charge. See *State* v. *Vilchel*, 112 Conn. App. 411, 417, 963 A.2d 658, cert. denied, 291 Conn. 907, 969 A.2d 173 (2009); see also Practice Book § 42-16.

[6] During his closing argument to the jury, defense counsel referenced the first amendment and entrapment issues.

[7] See Practice Book § 42-16.

[8] Our Supreme Court has stated that "when a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." *State* v. *Payne*, 303 Conn. 538, 562–63, 34 A.3d 370 (2012).

[9] "We previously have recognized that a claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Gibson*, 302 Conn. 653, 658–59, 31 A.3d 346 (2011). We note that following the argument of counsel, the defendant moved for a mistrial on the basis of the closing argument made by the prosecutor. The court denied the defendant's motion.

[10] "The propriety of the prosecutor's statement must, however, be examined in the context in which it was made." *State* v. *Felix*, 111 Conn. App. 801, 809, 961 A.2d 458 (2008).

[11] The state set forth the following in its brief: "Comments addressing the strength of the state's case are permissible when properly connected to evidence adduced at trial. . . . Because, however, the prosecutor did not directly connect the statement to evidence, the state agrees that the comment was improper." (Citation omitted.)

[12] Defense counsel objected to the prosecutor's question to members of the jury regarding what they would do if they saw red flashing lights in their rearview mirror while operating a motor vehicle. The court overruled the objection.

[13] The state directs our attention to *State* v. *Houle*, supra, 105 Conn. App. 824, in which the prosecutor improperly commented on his personal experience with alcohol. The state acknowledges the similarities between that case and the present one.