******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ANTHONY JOHNSON
(AC 35657)

Gruendel, Bear and West, Js.

*Argued February 10—officially released April 29, 2014*

(Appeal from Superior Court, judicial district of New
Britain, Alander, J.)

*Norman A. Pattis*, with whom was *Daniel M. Erwin*,
for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's

attorney, with whom, on the brief, was *Brian Preleski*, state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Anthony Johnson, appeals from the judgment of conviction of one count of murder in violation of General Statutes § 53a-54a. On appeal, the defendant claims that (1) the court improperly denied his motion to suppress two photographic array identifications, and (2) this case should be remanded to the trial court for an evidentiary hearing, where he can submit expert testimony on the fallibility of eyewitness testimony, so that the trial court can determine if he is entitled to a new trial in light of the Supreme Court's decision in *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012), which was decided after the defendant's trial.[1] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts on the basis of the evidence presented at trial. On October 31, 2009, several people, including the defendant and Iyshia Lamboy, attended a Halloween party at the Paris Bar in Bristol. Lamboy had known the defendant for three or four years. After the party broke up, Lamboy stopped at a Sunoco gas station, where the defendant, Freddy Felix (victim), and others were engaged in an argument. Lamboy noticed the red Acura automobile that the defendant was known to drive also at the Sunoco station. Lamboy later drove to Davis Drive in Bristol. When she arrived, the defendant's red Acura already was parked in the area. Approximately twenty-five people were gathered around some men, who were arguing. Lamboy got out of her car and stood next to the victim, who was standing next to his car. The defendant was present and standing off to the side. Two of the men who were arguing got into a fistfight, but the situation defused after some people agreed to leave. Soon thereafter, however, the fighting resumed, and the defendant, after stating that he "had the heat," walked over to his car, where Lamboy saw him place a mask over the bottom portion of his face, pull the hood of his sweatshirt over his head, and put on a dark nylon glove. Lamboy approached the defendant and began shouting at him. Other people then pulled her away from the defendant. The defendant approached the victim, pulled a gun from his chest area, and fired four shots, two of which hit the victim, killing him. The defendant ran from the area, leaving the red Acura behind.

Prior to the shooting, Ebony Shell, who lived in a second floor apartment on Davis Drive, was asleep in her bedroom when she was awoken by the sounds of people arguing outside. She looked out of her bedroom window and saw approximately thirty people gathered. She recognized the defendant, who was wearing a dark hooded sweatshirt. The defendant was arguing with a heavyset woman until two other people pulled her away from him.[2] Shell saw the victim standing next to his car, arguing with another man whom she knew as Javi.

The defendant then walked around a dumpster and reemerged with a mask covering part of his face and his hood raised over his head. He moved his arm toward his chest; Shell then saw flashes and heard gunfire, and she closed her curtain. Upon reopening the curtain, Shell saw a man lying on the ground, and the defendant was gone.

When the police conducted their investigation, they found, parked in the area, the red Acura that Lamboy had seen the defendant driving, which was registered to the defendant's father. Inside the car, they found the defendant's driver's license and a photograph of the defendant and his friend, Javier, which had been taken and printed at the Halloween party at the Paris Bar.

Very late on October 31, 2009, Michael Bergin picked up his friend, Anthony Garcia. The two later picked up the defendant and another man named Lamar. While in Bergin's vehicle, Lamar repeatedly asked the defendant why he shot the victim, and the defendant told Lamar not to discuss his business, but he later explained that there had been a fight at the Sunoco gas station, and, when the argument moved to Davis Drive, he went and got his gun. Bergin dropped off the defendant and Lamar at the Plymouth Motor Lodge, and the defendant paid him with cocaine for the ride. Bergin, fearing that he could be considered an accessory after the fact, went to a police station and told officers what he had heard. Two nights later, the police arrested the defendant at the Holiday Inn in Southington. On the defendant's nightstand was a newspaper clipping about the murder.

The defendant was charged and, after a jury trial, convicted of one count of murder. The court sentenced him to forty-five years imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims that the court improperly denied his motion to suppress the photographic array identification made by Shell and that it improperly failed to suppress, sua sponte, a photographic array identification made by Lamboy after it heard testimony during the trial.[3] Specifically, he argues that he "moved to suppress a photo array identification of the defendant by witness . . . Shell. . . . The court denied the motion based upon *State* v. *Marquez*, 291 Conn. 122, 967 A.2d 56 [cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163] (2009). . . . [E]ven if the court correctly applied *Marquez*, this was error in light of the state Supreme Court's ruling in *State* v. *Guilbert*, [supra, 306 Conn. 218]. *Guilbert* calls *Marquez* into question and requires reconsideration of the issue presented at trial.[4] The defendant also contends that, now, based upon the trial testimony the court should have suppressed the photo array identification of . . . Lamboy as well and raises the claim as to her under *State* v.

*Golding*, 213 Conn. 233, 567 A.2d 823 (1989), as it is a due process issue."[5] (Citation omitted.) He further contends that "[t]he absence of double blind, sequential arrays makes a photo array unduly suggestive in single perpetrator identifications."[6] (Emphasis omitted.) We are not persuaded.[7]

"[A] claim of an unnecessarily suggestive pretrial identification procedure is a mixed question of law and fact." *State* v. *Marquez*, supra, 291 Conn. 137. "[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . [T]he required inquiry . . . is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail on his claim, [a] defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect. . . .

"Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Internal quotation marks omitted.) *State* v. *Manson*, 118 Conn. App. 538, 543, 984 A.2d 1099 (2009), cert. denied, 295 Conn. 902, 988 A.2d 878 (2010), quoting *State* v. *Ledbetter*, 275 Conn. 534, 547–48, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

The following additional facts are relevant to our discussion. On May 11, 2011, the defendant filed a motion to suppress Shell's photographic array identification on the ground that the procedure employed by the police was unduly suggestive. At the May 18, 2011 hearing on the motion to suppress, two witnesses were presented, Shell and Detective Peter Dauphinais. Shell testified that she had "seen [the defendant] around and [had] heard talk of him," that she knew what he looked like, and that she had seen him "several times," but that she had never spoken to him. She testified about the shooting she had witnessed in the early morning hours of November 1, 2009, and she identified the defendant as the shooter. She stated that she was certain that it was the defendant whom she saw. She also testified that the area was well lit and that she had no trouble seeing from her bedroom window.

Shell also explained that she voluntarily, on her own initiative, went to the police station on November 5,

2009, where she was asked to view a photographic array. She testified that she neither was coached by the police nor directed in any way to pick the defendant's photograph from the array, but that she picked the defendant's photograph because he was the person whom she saw shoot the victim. Defense counsel asked Shell if that was the first time she had spoken to police about this case. Shell said that the police had knocked on her door the morning after the shooting and that she had spoken to them at that time. Counsel did not ask Shell about the content of that conversation.

Dauphinais testified that Shell previously had told police that she had not seen the shooting. He explained that she approached them later, however, and gave them information. Dauphinais also testified about the photographic array. He testified that the defendant was included in the array because he was a suspect and that the array procedure was blind, meaning that no names were listed, but that it was not a double-blind procedure, meaning that it was given by someone who knew which person in the array was a suspect. He also stated that no video was taken of the photographic array identification procedure.

After these two witnesses were presented, defense counsel argued that Shell initially told police she had not seen anything and that she then showed up at the police station several days later claiming to have seen the shooting from her bedroom window. Counsel argued that the procedure used in the identification process was not videotaped, that it was a nondouble-blind array, and that such procedures have "the danger of subtle influence and subtle bias and subtle suggestion . . . ."[8] He argued that "my claim would be that it is inherently suggestive to show a person . . . an array that contains a suspect in a nondouble-blind situation after he's been arrested and the community has been canvassed on multiple occasions for information. I concede there are gaps in that theory, but that's my claim, Judge." Defense counsel did not file a motion to suppress Lamboy's photographic array identification, nor object to its introduction, although he argues on appeal that the court should have suppressed it, sua sponte, nonetheless.

In opposition to the motion to suppress Shell's photographic array identification, the state argued before the trial court that the law does not require double-blind procedures or videotaping. It further argued that in this case, Shell testified that she had familiarity with the defendant and that she was certain of her identification and, therefore, suppression was not warranted.

Following testimony and the arguments of counsel, the court specifically found: "On November 5, 2009, [Shell] went to the police station to view a photo array. Prior to viewing the array, she was given a witness instruction for photo identification form, which, among

other things, said it was as important to clear innocent people as to identify the guilty. Persons in the photos may not look exactly as they did on the date of the incident because features like facial or head hair can change. The person you saw may or may not be in these photographs, and the police will continue and investigate this incident whether you identify someone or not.

"[Shell] was then shown a photo lineup with eight pictures, all of them African-American males, one of which included the defendant. She circled the defendant['s] [photograph], stating that the guy in number four is the person I saw shooting. This is the guy I know to be AJ, and this is the guy who shot the man over by the dumpster. She then signed the form.

"The photo array was administered by . . . Detective Peter Dauphinais. Peter Dauphinais was aware that the defendant was the suspect in the shooting, so it was not a double-blind photo array . . . . [Shell] had previously given a . . . statement to officers prior to viewing the photo array, indicat[ing] that she had not seen anyone involved in the shooting."

After finding these facts, the court explained to defense counsel: "[B]asically, what you're asking for is something I cannot give. You're asking that I find as a matter of law that a double-blind photo array is required; that's not currently the law in Connecticut. . . . The law is governed by *State* v. *Marquez*, [supra, 291 Conn. 122], and, in determining whether a pretrial identification procedure violated a defendant's due process rights, I have to find two things—that the particular identification procedure employed was unnecessarily suggestive, and, two, if the procedure was unnecessarily suggestive . . . [whether] the identification nevertheless [was] reliable in light of the totality of the surrounding circumstances."

On the basis of the facts found and the relevant law, the court held: "I find that the photo array was not unnecessarily suggestive. There's nothing in the composition of the photographic array that highlights the defendant in any way, he's not unique in any way, there's eight photos in the lineup. The witness was not either consciously or subconsciously—there's no evidence that [Shell] was, through police conduct, [that] they pointed to the defendant as the person she should pick out of the lineup. There's really nothing suggestive. . . . [F]or those reasons, I don't even get to the reliability . . . . I don't get to the reliability issue because I don't find that the array procedure was unnecessarily suggestive. So, for those reasons, the motion to suppress is denied." The court issued no ruling regarding Lamboy's photographic array identification of the defendant because the defendant did not include her identification in his motion to suppress, nor did he offer an objection to the admission of this evidence at trial.

On appeal, the defendant contends that the court should have suppressed both photographic array identifications because his right to due process was violated by allowing them into evidence. The state contends that the issue concerning Lamboy's identification is not reviewable because the defendant never offered an objection to this evidence, and, therefore, the record is not adequate for us to review the claim. Nevertheless, the state further contends that the introduction into evidence of either or both photographic array identifications was not improper because both Shell and Lamboy were familiar with the defendant before looking at the arrays, and the concerns raised by the defendant regarding suggestiveness and untrustworthiness in eyewitness identification procedures apply only to stranger identifications. We first conclude that there is no merit to the defendant's claim that the court, sua sponte, should have suppressed evidence of Lamboy's photographic array identification. The defendant offers no law that supports a holding that the trial court committed reversible error for failing to suppress evidence, "based upon trial testimony," after that evidence had been offered and admitted without any objection at any time during the trial. Accordingly, we conclude that further discussion of this aspect of the defendant's claim is unnecessary. As to the defendant's claim that his due process rights were violated because the police failed to utilize a double-blind procedure during Shell's photographic array identification and, therefore, that the array identification procedure was unduly suggestive, we agree with the trial court that the procedure employed in this case was not unduly suggestive.[9]

Over the course of time, our Supreme Court has continued to maintain "a stern test for suggestiveness: An identification procedure is unnecessarily suggestive *only* if it gives rise to a *very substantial* likelihood of irreparable misidentification." (Emphasis in original; internal quotation marks omitted.) *State* v. *Marquez*, supra, 291 Conn. 139. In *Marquez*, however, our Supreme Court revisited this test and determined that, over time, the court, essentially, had conflated the suggestiveness prong and the reliability prong. Id., 140–41. The court, then, redetermined "what makes a particular identification procedure 'suggestive' enough to require the court to proceed to the second prong and to consider the overall reliability of the identification" and set forth a new test for suggestiveness. Id., 142. The court explained that "a determination as to whether a particular identification procedure is 'unnecessarily suggestive' must focus on the [following] factors . . . ." Id., 144. "The first factor concerns the composition of the photographic array itself. In this regard, courts have analyzed whether the photographs used were selected or displayed in such a manner as to emphasize or highlight the individual whom the police believe is the suspect. . . . The second factor, which is related to the

first but conceptually broader, requires the court to examine the actions of law enforcement personnel to determine whether the witness' attention was directed to a suspect because of police conduct. . . . In considering this [factor, the court should] look to the effects of the circumstances of the pretrial identification, not whether law enforcement officers intended to prejudice the defendant. . . . It stands to reason that police officers administering a photographic identification procedure have the potential to taint the process by drawing the witness' attention to a particular suspect. This could occur either through the construction of the array itself or through physical or verbal cues provided by an officer." (Citations omitted; internal quotation marks omitted.) Id., 142–44.

The court further explained: "In evaluating the suggestiveness of a photographic array, a court should look to both the photographs themselves and the manner in which they were presented to the identifying witness. . . . We consider the following nonexhaustive factors in analyzing a photographic array for unnecessary suggestiveness: (1) the degree of likeness shared by the individuals pictured . . . (2) the number of photographs included in the array . . . (3) whether the suspect's photograph prominently was displayed or otherwise was highlighted in an impermissible manner . . . (4) whether the eyewitness had been told that the array includes a photograph of a known suspect . . . (5) whether the eyewitness had been presented with multiple arrays in which the photograph of one suspect recurred repeatedly . . . and (6) whether a second eyewitness was present during the presentation of the array." (Citation omitted; internal quotation marks omitted.) Id., 161.

In the present case, the defendant essentially argues that a nondouble-blind photographic array procedure, per se, is unduly suggestive. We disagree. In *Marquez*, our Supreme Court disagreed with the trial court's determination on this very issue, namely, that a nondouble-blind photographic array procedure, per se, is unduly suggestive. Id., 134–35. Our Supreme Court held that the factors previously set forth must be examined on a case-by-case basis and that a nondouble-blind procedure is *not* unduly suggestive, per se. Id., 156, 164–65.

In the present case, the trial court specifically found that Shell was given a proper witness instruction before she examined the photographic array, that the police did not consciously or subconsciously point her toward the defendant's photograph, and that she picked the defendant out of the array of eight photographs and stated that he was the shooter and that she knew him as AJ. The court then concluded that there was nothing unduly suggestive about the procedure employed during Shell's photographic array identification. On the basis of the court's findings, and the factors set forth

in *Marquez*, we agree that the procedure was not unduly suggestive.

## II

The defendant next claims that this case should be remanded to the trial court for an evidentiary hearing, where he can submit expert testimony on the fallibility of eyewitness testimony, so that the trial court can determine if he is entitled to a new trial in light of the Supreme Court's decision in *State* v. *Guilbert*, supra, 306 Conn. 218, which was decided after the defendant's conviction. He further argues that his claim should not fail on the ground that he never attempted to introduce expert testimony on this issue at trial, because, under the state of our law at that time, such testimony would have been inadmissible. He argues that the change in the law, essentially, is akin to newly discovered evidence or withheld evidence, and, therefore, he is entitled to an evidentiary hearing.

Citing Practice Book §§ 42-53, 42-54, and 42-55, along with General Statutes § 52-270, the state argues that this claim is not reviewable because the defendant did not file a motion or petition for a new trial after our Supreme Court released its decision in *Guilbert*. It also argues that the claim clearly fails to satisfy the standard for appellate review under the first prong of *State* v. *Golding*, supra, 213 Conn. 239–40, because the defendant never developed a record by attempting to offer expert testimony on eyewitness fallibility. In the alternative, the state argues that the claim is not entitled to *Golding* review because it is not of constitutional magnitude, it is an unpreserved evidentiary claim, and there is no record for review. We agree with the state that the record is inadequate for our review.[10]

Although the defendant argues that it would have been futile for him to have attempted to offer expert testimony because such testimony clearly was inadmissible under our law prior to *Guilbert*, we conclude that such a motion, at a minimum, would have served to perfect the record for appellate review, and, without such a record, the defendant's unpreserved claim is not reviewable on direct appeal. Cf. *State* v. *Taft*, 306 Conn. 749, 767–69, 51 A.3d 988 (2012) (because evidentiary hearing required, claim of ineffective assistance of counsel not appropriate for direct appeal because record inadequate).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In his appellate brief, the defendant sets forth his second claim as follows: "The Supreme Court's reversal on the issue of expert testimony of eyewitness identifications generates potentially exculpatory evidence and requires a new trial . . . ." During oral argument before this court, he clarified, however, that he is seeking a conditional remand to the trial court for the holding of an evidentiary hearing to enable him to present an expert on the issue of eyewitness identification fallibility, and that the trial court should determine whether he is entitled to a new trial after conducting the hearing.

[2] The defendant stipulated at trial that Lamboy was heavyset.

[3] The defendant does not specify what testimony should have triggered this sua sponte response from the court.

We also note that the defendant does not challenge the in-court identifications of him made by either Shell or Lamboy.

[4] We disagree with the defendant's contention that our Supreme Court's decision in *Guilbert* calls into question its decision in *Marquez*. We are unable to discern anything in *Guilbert* that would lead us to the conclusion that *Marquez* no longer is good law. See *State* v. *Guilbert*, supra, 306 Conn. 218; *State* v. *Marquez*, supra, 291 Conn. 122.

[5] To prevail under *Golding*, the defendant must establish all of the following conditions: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[6] The state argues that the defendant neither preserved nor properly briefed an issue regarding simultaneous rather than sequential photographs, and that we, therefore, should not consider this "passing" reference in the defendant's appellate brief. We agree with the state that the issue was neither raised before the trial court nor properly briefed and analyzed on appeal. Accordingly, we do not consider it.

[7] We note that the prepared yellow record does not contain a written memorandum of decision or a signed transcript setting forth the court's reasons for denying the motion to suppress. See Practice Book § 64-1 (a) (4). Although we frequently have declined to review claims on appeal due to an appellant's failure to provide such information, we will review the present claim on the basis of the unsigned transcript filed in this matter. See *In re Diamond J.*, 121 Conn. App. 392, 398–99, 996 A.2d 296, cert. denied, 297 Conn. 927, 998 A.2d 1193 (2010).

[8] We note that the defendant has not pursued in his appellate brief a claim regarding the failure of the police to videotape the identification procedure.

[9] The defendant also cites to the enactment, following his conviction, of General Statutes § 54-1p in further support of his claim. Section 54-1p (c) (2) provides: "The identification procedure shall be conducted in such a manner that the person conducting the procedure does not know which person in the photo lineup or live lineup is suspected as the perpetrator of the offense, except that, if it is not practicable to conduct a photo lineup in such a manner, the photo lineup shall be conducted by the use of a folder shuffle method, computer program or other comparable method so that the person conducting the procedure does not know which photograph the eyewitness is viewing during the procedure . . . ."

We do not agree with the defendant's contention that the enactment of § 54-1p elevated the best practice procedure of a double-blind array to the level of a constitutional requirement. As recently explained in C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 8.34, p. 618: "Out-of-court identifications may be inadmissible as a matter of federal or state constitutional law if they result from law enforcement procedures that violate due process because they are (1) unduly suggestive and (2) unreliable in light of the totality of the circumstances under which they were made. . . . [I]t is important to note that in 2011, the Connecticut legislature enacted [General Statutes] § 54-1p, which mandates that law enforcement conduct certain identification procedures, such as photo lineups, under prescribed rules.

"These rules, while not constitutionally mandated, are designed to increase the reliability of out-of-court identifications. The statute, however, is silent on whether violations by law enforcement of these provisions should affect the admissibility of an eyewitness' identification. The authors believe that violations of this statute, except those of constitutional magnitude, should not affect the admissibility of the identification but would be relevant to the weight to be accorded the identification or require a cautionary instruction to the jury. See *State* v. *Ledbetter*, [supra, 275 Conn. 534]."

[10] Because we conclude that the defendant has failed to provide a record adequate for appellate review, we find it unnecessary to determine whether his claim is evidentiary, constitutional, or evidentiary but with constitutional implications. See generally *State* v. *Crespo*, 303 Conn. 589, 606, 35 A.3d 243 (2012) ("although the defendant's unpreserved claim is evidentiary in nature, the issues implicated in this case are of constitutional magnitude").