******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* CECIL GRANT
(AC 35053)

DiPentima, C. J., and Prescott and Bear, Js.

*Argued September 8—officially released December 23, 2014*

(Appeal from Superior Court, judicial district of
Hartford, Dewey, J.)

*James B. Streeto*, assistant public defender, for the
appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's
attorney, with whom, on the brief, were *Gail P. Hardy*,
state's attorney, and *David L. Zagaja*, senior assistant
state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Cecil Grant, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2) and 53a-48, attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2) and 53a-49 (a) (2), and assault in the first degree in violation of General Statutes §§ 53a-59 (a) (5) and 53a-8. The defendant claims on appeal that (1) the trial court improperly denied his motion to suppress the victim's pretrial and trial identifications, (2) the court improperly permitted the state to present evidence of uncharged misconduct, and (3) he was denied his right to a fair trial due to prosecutorial impropriety. We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 10 p.m. on April 30, 2011, the defendant and two other individuals, Derek Newkirk and Mike Anderson, were visiting with Gustin Douglas at Douglas' apartment at 502 Mary Shepard Place in Hartford. The defendant and Newkirk told Douglas that they needed money, and the group discussed restaurants in the area that might have delivery persons who retained payments between deliveries. The defendant used Douglas' cell phone to order a pizza from Pizza 101 on Albany Avenue in Hartford. While waiting for the delivery person to arrive, the defendant displayed a revolver, waving it around and passing it between himself and Newkirk before putting it into the pocket of his hooded sweatshirt. Newkirk and the defendant went outside to meet the delivery driver; Douglas and Anderson remained inside.

At approximately 11 p.m., the victim, a delivery person for Pizza 101, was dispatched to make a delivery to 502 Mary Shepard Place. She initially had trouble finding the address. She called the telephone number indicated on the order slip, and a man answered and provided her with directions. When she arrived at the address, the defendant approached the front passenger door of the victim's vehicle. Newkirk stood near the defendant. Both men's faces were uncovered and clearly visible to the victim. The defendant spoke with the victim through the open passenger side window, asking her several times if she had change; the victim responded each time that she did not. The defendant then displayed a revolver, which he placed against the passenger door, stating, "[W]ell, gimme this." Simultaneously, the defendant attempted to open the front passenger door but was unable to do so.

After seeing the defendant holding the revolver, the victim started to drive away, at which time the defendant began shooting. Five bullets entered the car, strik-

ing the victim in the neck, chin, shoulder and arm. Because Mary Shepard Place is a dead-end street, the victim had to turn her vehicle around and pass by the defendant and Newkirk in order to get away. The victim drove herself to a hospital. The defendant and Newkirk returned to Douglas' apartment. Douglas, who had heard the gunshots, observed that the defendant and Newkirk were acting "[l]ike they were nervous" when they returned, but he did not discuss with them what had happened outside.

The police were dispatched to the hospital, where they photographed and secured the victim's vehicle. A detective later interviewed the victim about the shooting. The victim described her shooter as a black male of light to medium complexion, short hair, skinny build, five feet, six inches tall, between sixteen and seventeen years old, wearing jeans and a black hooded sweatshirt over a shirt with a design on it. The police investigated the cell phone number that the victim had called to obtain directions prior to the shooting, which eventually led them to speak with Douglas. Douglas provided the police with details about his interactions with the defendant and Newkirk on the night of the shooting, which led the police to consider them as suspects. Douglas also identified photographs of the defendant and Newkirk in police photographic arrays. The police later asked the victim to look at photographic arrays, from which the victim was able to identify both the defendant and Newkirk.

The defendant was arrested and charged with conspiracy to commit robbery in the first degree, attempt to commit robbery in the first degree, and assault in the first degree. The jury found the defendant guilty of all the charges. The court thereafter sentenced the defendant to a total effective term of sixty years of incarceration, suspended after forty years, followed by five years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims on appeal that the court improperly denied his motion to suppress the victim's pretrial and trial identification on the ground that the photographic array and procedures used by the police to identify him were unduly suggestive.[1] In particular, the defendant argues that important protocols concerning the administration of photographic arrays were not followed and that aspects of the photographs used in the array rendered the array itself unnecessarily suggestive. In response, the state contends that the defendant failed to raise to the trial court seven of the eight purported problems with the array and its administration now identified by the defendant in his appellate brief and, thus, they are not properly preserved for appellate review. With respect to the single issue that the state concedes was preserved, which involves the sugges-

tiveness of the array itself, the state contends that the court properly ruled that the array was not unnecessarily suggestive. Ultimately, we conclude that the defendant has failed to demonstrate that the identification procedures and the array utilized by the police in the present case were unnecessarily suggestive and, thus, has failed show that the court improperly denied his motion to suppress.

The following additional facts, which are undisputed in the record or which the court found in ruling on the motion to suppress, are relevant to our resolution of the defendant's claim. The police developed the defendant and Newkirk as possible suspects on the basis of their interview of Douglas and his identification of the defendant and Newkirk in photographic arrays.[2] The police next prepared two photographic arrays to present to the victim, one containing a photograph of the defendant and the other a photograph of Newkirk. Each array consisted of a single sheet of paper containing eight headshot photographs of different men numbered one through eight. In the array containing the defendant's photograph, the defendant was the only person that appeared to be wearing a hooded sweatshirt. Otherwise, the individuals in the defendant's array all had similar appearances and physical characteristic.

On July 12, 2011, approximately ten weeks after the shooting, the victim was asked by Detective Anthony Pia of the Hartford Police Department, who had taken over the investigation into the shooting, to meet and to look at photographic arrays. Prior to showing the arrays to the victim, the detective gave her an instruction sheet that provided, among other things, that the photograph of a suspect may or may not be included in the array and that the police would continue to investigate the incident regardless of whether the victim identified someone in the array. The victim signed the instruction sheet, acknowledging that she understood those directions.[3] After the victim was shown the array containing the defendant's photograph, the victim identified the defendant as her shooter.

Prior to trial, the defendant filed a motion to suppress any pretrial or in-court identification of the defendant by the victim. The defendant asserted in his motion that the pretrial identification procedures used by the police were unnecessarily suggestive and unreliable under the circumstances, that any later in-court identification by the victim necessarily would be tainted irretrievably by the prior illegal identification, and that any identification would fail to meet the standards of neutrality and reliability as enunciated in our case law. The court held an evidentiary hearing on the motion to suppress, at which the victim and Pia testified.

Following the evidentiary hearing, the court heard arguments from the parties. The defendant argued that the array containing his photograph was unnecessarily

suggestive because he was the only person in the array that was wearing a hooded sweatshirt, and the victim previously had provided the police with a description indicating that her assailant had been wearing a black hooded sweatshirt. The defendant made no other arguments regarding the suggestiveness of the array itself or the procedures utilized by the police in obtaining the identification. The defendant did raise several additional points relative to the overall reliability of the victim's identification, including that the victim's encounter with her assailant had occurred at night; that her opportunity to observe him lasted only a few minutes, a part of which time she also was observing Newkirk; that she was in fear for her life at the time of the incident; and that she already had started to drive away when the gunshots were fired and, thus, did not have an opportunity to see who fired the gun. The state argued that the fact that the defendant was the only one in the array wearing a hooded sweatshirt was not, in and of itself, enough to support a finding that the array was unnecessarily suggestive, and that even if the court disagreed, the identification was nonetheless reliable when viewed in light of the victim's testimony in its entirety.

After arguments concluded, the court rendered an oral decision, denying the motion to suppress. It found on the basis of its own review of the photographic array that the array was not unduly suggestive. The court rejected the defendant's suggestion that the victim had identified the defendant because he was the only one pictured in the array wearing a hooded sweatshirt, noting that the victim's prior description was that the shooter had been wearing a black hooded sweatshirt and the defendant was wearing a white hooded sweatshirt in the array. The court suggested that if the victim had identified her assailant solely on the basis of clothing, as the defendant suggested, she was just as likely to have picked one of the subjects wearing a black shirt.

Following the trial, the court issued a written memorandum of decision setting forth in further detail its findings of fact and conclusions of law regarding the motion to suppress. The court concluded in relevant part: "The police officers did not influence the [victim] in any manner, nor did they direct [her] attention to any photograph. . . . The individuals selected for the array had similar physical characteristics. [The victim] had ample opportunity to observe the defendant. She spoke with him for several minutes, during that time looking directly at the defendant, who was standing a few feet away. There was sufficient light; there were no visual obstructions or impediments. There is no evidence of any discrepancy between [the victim]'s description and the defendant's actual appearance at the time of the observations. Finally, [the victim] identi-
fied the defendant within weeks of the initial observa-

tion. Her identification was not hesitant; it was not equivocal."

We begin our analysis of the defendant's claim by setting forth the well established legal principles and standard of review that guide our consideration of a constitutional challenge to an eyewitness identification. As previously noted, "[i]n determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances. . . . We emphasized in [*State* v. *Outing*, 298 Conn. 34, 48, 3 A.3d 1 (2010), cert. denied, U.S.     , 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011)] that [w]e continue to endorse and adhere to this widely utilized analytical approach. . . . Therefore, [t]he critical question . . . is what makes a particular identification procedure suggestive enough to require the court to proceed to the second prong and to consider the overall reliability of the identification. . . . In deciding that question . . . the entire procedure, viewed in light of the factual circumstances of the individual case . . . must be examined to determine if a particular identification is tainted by unnecessary suggestiveness. The individual components of a procedure cannot be examined piecemeal but must be placed in their broader context to ascertain whether the procedure is so suggestive that it requires the court to consider the reliability of the identification itself in order to determine whether it ultimately should be suppressed." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Revels*, 313 Conn. 762, 771–72, 99 A.3d 1130 (2014).

"Upon review of a trial court's denial of a motion to suppress, [t]he court's conclusions will not be disturbed unless they are legally and logically inconsistent with the facts. . . . [W]e will reverse the trial court's ruling [on evidence] only where there is abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Internal quotation marks omitted.) *State* v. *Elliston*, 86 Conn. App. 479, 482–83, 861 A.2d 563 (2004), cert. denied, 273 Conn. 906, 868 A.2d 746 (2005). "Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will

not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Internal quotation marks omitted.) *State* v. *Johnson*, 149 Conn. App. 816, 822, 89 A.3d 983, cert. denied, 312 Conn. 915, 93 A.3d 597 (2014). With these principles in mind, we turn to the defendant's claim that the court improperly denied his motion to suppress because the photographic array and identification procedures the police utilized in the present case were unnecessarily suggestive.

In his brief, the defendant contends, as he did to the trial court, that his photograph impermissibly stood out from the remaining subjects because he was the only person in the array wearing a hooded sweatshirt. Additionally, he raises a number of other theories that were not raised in the motion to suppress or argued by defense counsel at the evidentiary hearing on the motion, and that, consequently, never were considered by the court in ruling on the motion. In particular, the defendant describes the following additional concerns with the photographs used in the array: the other subjects look older than the victim's initial estimate of her assailant's age; the skin tone of two of the subjects does not match the victim's prior description of a medium to light complected black male; the victim described her assailant as being approximately five feet, six inches tall and skinny, and the defendant is the smallest person in the array; and the defendant had the shortest haircut. The defendant also raises the following additional concerns with the identification procedure utilized by the police: the police failed to inform the victim that she did not need to make an identification; the administration of the photographs was not double blind;[4] and the photographs were presented to the victim simultaneously rather than sequentially.[5] The state argues that the additional theories that the defendant raises for the first time on appeal are unpreserved and, thus, unreviewable. Accordingly, before we can consider the merits of the defendant's claim regarding the suggestiveness of the identification procedure, we must consider to what extent the various theories supporting that claim have been preserved for appellate review.

The defendant suggests that by moving to exclude the victim's identification from evidence on the general ground that it was unnecessarily suggestive, he properly preserved for appeal any and all theories supporting that ground, regardless of whether they were actually raised to or considered by the trial court in ruling on his motion to suppress. It is well settled, however, that "[a] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . . For this court to . . . consider [a] claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair both to the [court] and to the opposing party." (Internal quotation marks omitted.) *State* v. *Santana*, 313 Conn. 461,

466–67, 97 A.3d 963 (2014). In *Santana*, our Supreme Court recently held that a party's general denial made in response to a hearsay objection was insufficient to preserve for appeal, functionally or otherwise,[6] any and all hearsay exceptions that the party could have but failed to argue before the trial court. Id., 468–69. We can discern no reason why the present case is distinguishable from *Santana* with respect to the issue of preservation. A general assertion that identification procedures were unnecessarily suggestive and that any resulting identification should be excluded from evidence is insufficient to preserve for appeal arguments that the defendant might have but failed to argue before the trial court in support of that assertion. To hold otherwise would be unfair both to the trial court, which never had an opportunity to consider the arguments now raised on appeal in ruling on the defendant's motion to suppress, and to the state, which never had notice and an opportunity to defend against such arguments. We accordingly agree with the state that the defendant's arguments with respect to the suggestiveness of the identification procedures largely are unpreserved.

The defendant requests that to the extent we determine that certain aspects of his claim are not preserved, we review them pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[7] Pursuant to *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis omitted; footnote omitted.) Id., 239–40. "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail [on the merits]." (Internal quotation marks omitted.) *State* v. *Brown*, 279 Conn. 493, 500, 903 A.2d 169 (2006). Thus, *Golding* review of an unpreserved constitutional claim is available provided that the defendant can "present a record that is [adequate] for review and affirmatively [demonstrate] that his claim is indeed a violation of a fundamental constitutional right." (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 755, 91 A.3d 862 (2014).

We agree with the defendant that the reviewability prongs of *Golding* are satisfied here. His challenge regarding the suggestiveness of the identification procedures implicates the reliability of the identification and, thus, his constitutional right to due process. See *State* v. *Marquez*, 291 Conn. 122, 137, 967 A.2d 56, cert. denied,

558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). Furthermore, although the resolution of a claim of unnecessary suggestiveness requires an ad hoc, fact-based inquiry; see id., 156 n.33; the current record, which includes both the photographic array and testimony from the victim and Detective Pia regarding the procedures followed,[8] is sufficient for us to review the defendant's suggestiveness argument in its entirety to determine whether the defendant has clearly established a due process violation.

We turn then to the defendant's specific arguments regarding the suggestiveness of the array itself. At the hearing on the motion to suppress, the defendant argued that the array was unduly suggestive because he was the only subject included in the array wearing a hooded sweatshirt. He contends on appeal that this was unduly suggestive because the victim previously had described her assailant as wearing a hooded sweatshirt and because, more generally, his hooded sweatshirt made his photograph impermissibly stand out from the other photographs. Although conducting a live or photographic lineup in which the suspect is the only one wearing "distinctive clothing [that] the culprit allegedly wore" might be a sufficient basis to conclude that the lineup was unnecessarily suggestive; *United States* v. *Wade*, 388 U.S. 218, 233, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); the trial court properly determined that such a concern was not present here.

Hooded sweatshirts, or "hoodies," are not distinctive items of clothing; rather, they are ubiquitous. See, e.g., *People* v. *McBride*, 14 N.Y.3d 440, 448, 928 N.E.2d 1027, 902 N.Y.S.2d 830 (hooded sweatshirt "generic and common article of clothing"), cert. denied,      U.S.     , 131 S. Ct. 327, 178 L. Ed. 2d 212 (2010). Although the victim had indicated to the police that the shooter had been wearing a black hooded sweatshirt, it was not a prominent feature of the victim's identification of her assailant, which included a number of other descriptive facts. In his array photograph, the defendant was wearing a white hooded sweatshirt, not a black hooded sweatshirt as allegedly worn by the perpetrator. Further, nothing in the record indicates that the victim relied on clothing to identify the defendant's photograph in the array; in fact, the only testimony elicited at trial was to the contrary.[9] Additionally, there was nothing unusual or distinctive about the white hoodie worn by the defendant in the array photograph that arguably could be viewed as making his photograph stand out from those of the other subjects. Accordingly, as to the sole preserved issue, we conclude that the court did not abuse its discretion in rejecting the defendant's argument that his wearing a hooded sweatshirt in the photograph was a valid basis for finding the array unnecessarily suggestive.

The defendant also argues for the first time on appeal

that his photograph was the only one in the array that matched the victim's initial description regarding age, height and body type, that two subjects in the array did not have medium to light complexions in accordance with the victim's earlier description and that the defendant's haircut was the shortest. Although the trial court did not consider these specific arguments, the court did made an express finding that the subjects depicted in the defendant's photographic array all had similar appearances, and that express finding is fully supported by our own review of the array. The photographs in the array only show the subjects' heads and shoulders, and there are no height indicators visible in the photographs. Accordingly, any significant differences in height and body type are not readily observable from the array. Although there certainly are differences between the defendant and the other subjects in the array with respect to skin tone, hair and other features, we agree with the court that the subjects are sufficiently similar in appearance to withstand any claim of unnecessary suggestiveness.

We next turn to the defendant's unpreserved argument that the identification procedures utilized by the police in the present case were unnecessarily suggestive because the administration of the photographs was not double blind and sequential, and the police failed to inform the victim that she did not need to make an identification.

As to the latter argument, we find that it lacks merit because the instruction sheet given to the victim prior to her viewing of the photographic array clearly provided that the perpetrator may or may not be one of the persons in the photographs, and the array itself contained a notice indicating that the victim "should not conclude or guess that the photographs contain the person who committed the offense under investigation."

The defendant has also failed to demonstrate how the failure by the police to use a double blind and sequential photographic lineup in the present case rendered the procedure actually used unnecessarily suggestive. To the extent that the defendant has relied on our Supreme Court's decision in *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012), that reliance is misplaced. The principal issue before the court in *Guilbert* was not whether any particular identification procedures are constitutionally mandated, but whether courts are obligated to admit under specified circumstances qualified expert testimony concerning the fallibility of eyewitness identification under *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), to aid juries in their evaluation of identification evidence. *State* v. *Guilbert*, supra, 221.

The court in *Guilbert* acknowledged "widespread

judicial recognition that eyewitness identifications are potentially unreliable in a variety of ways unknown to the average juror." Id., 234. In particular, the court mentioned that "[c]ourts across the country now accept that [among other things] . . . identifications are likely to be less reliable in the absence of a double-blind, sequential identification procedure . . . ." (Footnotes omitted.) Id., 237–39. Nothing in *Guilbert*, however, suggests that if the police show the photographs to the witness simultaneously and the procedure is administered by an officer who knows the identity of the suspect, the procedure is unnecessarily suggestive as a matter of law. In ruling that experts in appropriate circumstances should be allowed to testify about issues that may affect the accuracy of identifications, the court was not concerned with the *admissibility* of identification evidence, but rather with a jury's proper exercise of its duty to evaluate *the weight* to be given to a particular eyewitness' identification.

In *State* v. *Marquez*, supra, 291 Conn. 122, our Supreme Court held that the use of a nondouble-blind photographic array was not per se unduly suggestive, and that identification procedures must be evaluated for suggestiveness on a case-by-case basis. Id., 134–35. This court recently applied that holding, post-*Guilbert*, noting our inability "to discern anything in *Guilbert* that would lead us to the conclusion that *Marquez* no longer is good law." *State* v. *Johnson*, supra, 149 Conn. App. 821 n.4. The defendant is unable to point to anything in the current record that establishes that the identification procedure used in the present case was unnecessarily suggestive other than baldly to state that it was not double blind and sequential, a procedure determined to be more reliable, but not, as explained, constitutionally mandated.[10] Consequently, the defendant has failed to meet his burden under the third prong of *Golding* of establishing a clear constitutional violation.

Because the defendant has failed to demonstrate that the photographic array or the procedures utilized by the police with the victim in identifying the defendant were unnecessarily suggestive, we need not reach the defendant's arguments regarding the overall reliability of the resulting identification. See *State* v. *Nieves*, 106 Conn. App. 40, 51, 941 A.2d 358, cert. denied, 286 Conn. 922, 949 A.2d 482 (2008); see footnote 1 of this opinion. In sum, we reject the defendant's claim that the court improperly denied his motion to suppress.

II

The defendant next claims that the court improperly allowed the state to present "a plethora of evidence" concerning uncharged misconduct of the defendant. In response, the state argues that, contrary to the defendant's claim, it never introduced any evidence of uncharged misconduct and, therefore, the defendant's

claim fails as a matter of law. We agree with the state.

The following additional facts and procedural history are relevant to our review of this claim. The state did not present any evidence in its case-in-chief of other crimes allegedly committed by the defendant. The defendant presented an alibi defense, testifying on direct examination that he was at his home in the south end of Hartford at the time the victim was shot. At the close of the defendant's direct testimony, *defense counsel* asked the defendant whether he had a gun with him on the night the victim was shot and whether he had shot anyone that night. In response to both questions, the defendant answered, "No."

During cross-examination, the prosecutor revisited those responses. The prosecutor then asked the defendant whether he remembered "the robbery at Franklin Package store."[11] Defense counsel immediately objected, and asked the court to excuse the jury.

Defense counsel argued outside the presence of the jury that she objected to any evidence being introduced of other robberies or prior arrests involving the defendant because the defendant had not been convicted of any other crimes, and that any such evidence had absolutely no probative value as to the defendant's guilt in the present matter and was extremely prejudicial. The state argued that on the basis of the defendant's testimony that he was not involved in the shooting of the victim and had never had a gun, the state was entitled to question the defendant about earlier arrests and specific acts of misconduct because they spoke to the defendant's veracity. The state specifically sought to question the defendant about a robbery of a package store on Franklin Avenue in Hartford that had occurred approximately five months prior to the present shooting, and in which it was alleged that the defendant had spent time asking the store attendant if she had change for a hundred dollar bill before leaving and then returning with another individual in masks to rob the store. The state also sought to question the defendant about three additional incidents that had occurred more than one year prior to the current shooting, one involving an arrest of the defendant and Newkirk for the theft of an automobile in East Hartford during which the defendant allegedly was in possession of a gun, and two other incidents involving stolen jewelry.

When the court asked the state if it was offering the evidence "as sort of a signature," the state responded that it was offered "for intent to commit the robbery and identity." The court ruled that it would allow the state to introduce evidence only of the Franklin Package incident because it involved sufficiently similar facts and circumstances and was close enough in time that its probative value outweighed any prejudice to the defendant. The court clearly indicated that the state was not allowed even to ask questions regarding any

of the other incidents.

The cross-examination of the defendant resumed, and the following colloquy between the defendant and the prosecutor took place with respect to the Franklin Package robbery:

"Q. Do you remember committing a robbery at the Franklin Package store—

"A. No.

"Q. —December 22nd—

"A. No, I do not.

"Q. —five months before May 1st?

"A. No, I do not.

"Q. You do not?

"A. No.

"Q. Do you remember being with your brother, Devin Kempson?

"A. No, I do not.

"Q. Do you remember going into that store, into that package store and asking the attendant for $100 change?

"A. No, I do not.

"Q. You didn't ask her for change for $100?

"A. No, I did not.

"Q. So, that wasn't you?

"A. No, it wasn't.

"Q. Then coming back with a mask on—

"A. No.

"Q. —and a gun in hand?

"A. No, no.

"Q. Wasn't you?

"A. Wasn't me."

The Franklin Package robbery was referenced briefly one other time, at the close of cross-examination, when the prosecutor asked the defendant if he knew what a revolver looked like and whether he ever had had a revolver. The defendant stated that he knew what a revolver was, but that he never had had one. The prosecutor then asked, "You didn't have a revolver when the Franklin Avenue package store was robbed?" The defendant answered, "No." The state never attempted to present any extrinsic evidence of the defendant's alleged involvement in the Franklin Package incident.

"As a general rule, *evidence* of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defen-

dant has a bad character or a propensity for criminal behavior." (Emphasis added; internal quotation marks omitted.) *State* v. *Randolph*, 284 Conn. 328, 340, 933 A.2d 1158 (2007); see also Conn. Code Evid. § 4-5 (a).

In the present case, however, no facts of prior misconduct by the defendant were ever admitted into evidence. As we repeatedly have recognized, "a question from counsel is not evidence of anything." *Zollo* v. *Commissioner of Correction*, 133 Conn. App. 266, 274 n.6, 35 A.3d 337, cert. granted on other grounds, 304 Conn. 910, 39 A.3d 1120 (2012); see also *State* v. *Bonsu*, 54 Conn. App. 229, 234–35, 734 A.2d 596 (rejecting claim that prosecutor's unanswered question about prior conviction was improperly elicited evidence because "questions are not evidence"), cert. denied, 251 Conn. 909, 739 A.2d 1249 (1999).

Here, the jury was never presented with any actual evidence of uncharged misconduct of the defendant. The prosecutor's questions were not evidence; it is the responses to those questions that would constitute evidentiary facts. Throughout his questioning by the prosecutor about the Franklin Package robbery, the defendant maintained that he was not involved. The state did not offer any evidence to rebut the defendant's testimony. Although the jury was entitled to disbelieve the defendant's testimony, it was not entitled to infer that the opposite was true. The defendant has not cited to any portion of the record that supports his claim that "a plethora" of uncharged misconduct evidence was admitted by the court, nor has our own review of the record revealed any such evidence.

We recognize that in its instructions to the jury, the court stated in relevant part that "[t]he state has offered evidence of other acts of misconduct of the defendant. The defendant denied the misconduct." The court next instructed the jury that such evidence was not admitted to prove that the defendant had a bad character or a tendency to commit criminal acts, but only to show or establish intent. The jury was instructed that it could consider such evidence only if the jury believed it and found that it logically, rationally and conclusively supported the issue for which it was offered, namely, the issue of intent.

We need not address, however, to what extent the court's instruction was unwarranted or misleading to the jury in light of our conclusion that no uncharged misconduct evidence actually was admitted. Neither party has challenged the propriety of the court's jury instructions on appeal and, therefore, any error on the part of the court has been waived. The mere fact that the trial court instructed the jury in this manner does not change the reality that, under our well established law, no misconduct evidence was admitted into evidence. Because we conclude that the court did not admit any evidence of prior misconduct, we need not

discuss whether the evidence the state proffered would have been admissible to establish either intent or identity. The defendant's claim fails as a matter of law.

III

Finally, the defendant claims that he was deprived of his due process right to a fair trial as a result of prosecutorial impropriety. We consider the arguments raised in support of this claim as falling roughly into two categories. First, the defendant takes issue with what he describes as the prosecutor's overly aggressive and sarcastic tone, both during the cross-examination of the defendant and at closing argument, which the defendant maintains impermissibly appealed to the jury's emotions and expressed the prosecutor's personal belief as to the credibility of the defendant. Second, the defendant argues that the prosecutor improperly commented on the defendant's failure to call his mother as a witness in violation of our Supreme Court's holding in *State* v. *Malave*, 250 Conn. 722, 738, 737 A.2d 442 (1999) (en banc), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000).[12] With the exception of the missing witness argument, we do not agree with the defendant that the prosecutor engaged in impropriety, nor do we conclude that the *Malave* violation deprived the defendant of a fair trial. Accordingly, we reject the defendant's claim.

The standard we apply to claims of prosecutorial impropriety is well established. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . . [If] a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Ross*, 151 Conn. App. 687, 693, 95 A.3d 1208, cert. denied, 314 Conn. 926,      A.3d      (2014).

As an initial matter, we note that the defendant concedes that he did not object at trial to any of the comments that he now claims constitute prosecutorial impropriety. "It is well established law, however, that a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, [supra, 213 Conn. 239–40], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. . . . Our

Supreme Court has explained that the defendant's failure to object at trial to each of the occurrences that he now raises as instances of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his claims. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time." (Citations omitted; internal quotation marks omitted.) *State* v. *Maner*, 147 Conn. App. 761, 782, 83 A.3d 1182, cert. denied, 311 Conn. 935, 88 A.3d 550 (2014).

A

We first examine the defendant's argument that, during his cross-examination and at closing argument, the prosecutor used overly sarcastic and aggressive tactics that impermissibly appealed to the emotions of the jury or expressed the prosecutor's personal belief regarding the defendant's credibility. We are not persuaded that the prosecutor crossed the line between permissible argument and rhetoric to prosecutorial impropriety.

"It is well established that a prosecutor may not appeal to the emotions, passions and prejudices of the jurors by denigrating a witness through the frequent and gratuitous use of sarcasm." *State* v. *Andrews*, 313 Conn. 266, 283, 96 A.3d 1199 (2014). "[W]e have recognized that the excessive use of sarcasm may improperly influence a jury. . . . A prosecutor should conduct his examination of a witness fairly, objectively and with decorum, and he should not ridicule or browbeat a witness. . . . [N]eedless sarcasm [is] inconsistent with [a] state's attorney's professional responsibility . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Kendall*, 123 Conn. App. 625, 637–38, 2 A.3d 990, cert. denied, 299 Conn. 902, 10 A.3d 521 (2010).

"Although we neither encourage nor condone the use of sarcasm, we also recognize that not every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) Id., 642. "[S]ome use of sarcastic and informal language, when intended to forcefully criticize a defense theory on the permissible bases of the evidence and the common sense of the jury, is not necessarily improper." *State* v. *James*, 141 Conn. App. 124, 150, 60 A.3d 1011, cert. denied, 308 Conn. 932, 64 A.3d 331 (2013). Further, it is important to note that "defense counsel's failure to object to allegedly sarcastic and denigrating comments and questions by the prosecutor during cross-examination, as in the present case, suggests that counsel did not believe the alleged improprieties were unfair in light

of the record at that time." *State* v. *Andrews*, supra, 313 Conn. 283–84.

It is equally well established that "[a] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . It is not, however, improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Donald H. G.*, 148 Conn. App. 398, 423, 84 A.3d 1216, cert. denied, 311 Conn. 951, A.3d (2014).

With respect to the defendant's cross-examination, defense counsel has directed our attention to several instances of alleged sarcasm, including the prosecutor's stating, "really?" in response to an answer given by the defendant and repeating the defendant's answer back in a sarcastic tone. Having reviewed the transcript of the cross-examination and considering the prosecutor's language in context, we are unconvinced that any of the questions or remarks identified by the defendant as sarcastic or aggressive were improper.

Our Supreme Court recently rejected a claim that a prosecutor's remark of "[c]ome on" in response to an answer given by a defendant on cross-examination was inappropriate because the remark was an "attempt to ensure that the defendant was being truthful . . . ." *State* v. *Andrews*, supra, 313 Conn. 292. We view the prosecutor's use of "really?" in the present case and his repeating back answers given by the defendant in the same light, namely, as an attempt to confirm the truth or to clarify the defendant's responses to his questions. See also *State* v. *Kendall*, supra, 123 Conn. App. 639 (repetitions of defendant's answers by prosecutor did not necessarily demonstrate impermissible sarcasm rather than effort to confirm or clarify defendant's responses). Further, it was entirely appropriate for the state to forcefully cross-examine the defendant to test the veracity of his alibi defense give that "cross-examination is the principal means by which the credibility of witnesses and the truth of their testimony is tested." *State* v. *Lee*, 229 Conn. 60, 69–70, 640 A.2d 553 (1994). In sum, our review reveals no instances of prosecutorial impropriety during the defendant's cross-examination.

The defendant also directs our attention to the following examples of what he describes as the prosecutor's

continued use of sarcasm during closing and rebuttal arguments: (1) the prosecutor described as "cockama-mie" the exchange that occurred between the defendant and the victim prior to the shooting about whether the victim had change; (2) after asking the jury to compare the reliability of the defendant's testimony with that of the victim, the prosecutor stated, "[p]athetic"; (3) the prosecutor stated that the defendant was "being voted father of the year because he spends every waking hour with his child"; (4) after pointing out inconsistencies in the testimony of the defendant and his alibi witness, the prosecutor stated, "They can't even get their stories straight, all right?"; (5) the prosecutor stated that it was "ridiculous" that the defendant's investigator wanted the jury to believe that the lighting was poor at night in the area where the shooting occurred, but the investigator had visited the area only during the middle of the day; and (6) the prosecutor asked rhetorically, "Is [the defendant's] alibi any bit believable," before discussing details of the alibi defense.

As we have often repeated, "[i]n determining whether [prosecutorial impropriety] has occurred [in the course of closing arguments], the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) *State* v. *Daniel G.*, 147 Conn. App. 523, 555, 84 A.3d 9, cert. denied, 311 Conn. 931, 87 A.3d 579 (2014).

We already have stated that limited use of sarcasm by a prosecutor, although not condoned, does not rise to the level of prosecutorial impropriety. Further, it is important to draw a distinction between sarcastic comments intended to disparage the defendant or defense counsel and "argument that disparages a theory of defense." *State* v. *Orellana*, 89 Conn. App. 71, 101, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005). Most of the defendant's examples of alleged impropriety during closing argument fall within this latter category, and, although at times the comments or statements were inartful, we cannot conclude that they amounted to impropriety. For example, in beginning his discussion of the defendant's alibi defense by

questioning rhetorically whether the defendant's alibi defense was "any bit believable," the prosecutor was not stating his opinion, but asking the jury to question whether the evidence supporting the alibi defense was credible. The prosecutor's remark that the defendant and his alibi witness couldn't get their stories straight was preceded by a recitation of the evidentiary basis for that statement. The defendant had testified that he was at home at the time of the shooting and that he had been driven there by the alibi witness, whereas the alibi witness testified that her son had driven the defendant home. Thus, rather than being an expression of the prosecutor's opinion, the prosecutor was asking the jury to draw a reasonable inference that the alibi defense was untrue from the factual inconsistencies in the testimony of the defendant and the alibi witness. We view the remainder of the alleged improprieties as rhetorical language that neither strayed from the evidence nor diverted the jury's attention from the facts at issue.

B

We next consider the defendant's argument that the prosecutor violated our Supreme Court's holding in *State* v. *Malave*, supra, 250 Conn. 722, because he commented at closing argument that the defendant had failed to call his mother as a witness to corroborate his alibi defense without having given prior notice to defense counsel or to the court of his intent to make such a remark. The state concedes that the prosecutor failed to adhere to the notice requirement set forth in *Malave*, but maintains that the defendant "did not object below, fails to show harm from lack of notice, and does not claim or show that the missing witness argument itself, beyond the lack of notice, was improper." We agree that the prosecutor acted improperly by arguing to the jury, without first providing the required notice, that the defendant had failed to call his mother as a corroborating witness but, ultimately, conclude that the impropriety did not deprive the defendant of a fair trial.

In *Malave,* our Supreme Court "abandoned the rule enunciated in *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960), which had permitted trial courts to instruct the jury that [t]he failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause. . . . Although the [c]ourt in *Malave* abandoned the *Secondino* rule, it did not prohibit counsel from making appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case. . . . The court did, however, prohibit counsel from directly urging the jury to draw an adverse inference by virtue of the witness' absence. . . . Addi-

tionally, the court stated that [f]airness, however, dictates that a party who intends to comment on the opposing party's failure to call a certain witness must so notify the court and the opposing party in advance of closing arguments. Advance notice of such comment is necessary because comment on the opposing party's failure to call a particular witness would be improper if that witness were unavailable due to death, disappearance or otherwise. That notice will ensure that an opposing party is afforded a fair opportunity to challenge the propriety of the missing witness comment in light of the particular circumstances and factual record of the case." (Citations omitted; internal quotation marks omitted.) *State* v. *DeCarlo*, 92 Conn. App. 565, 570–71, 887 A.2d 378 (2005).

In the present case, the defendant's alibi defense rested in part on his testimony that he had returned home on the night of the shooting before 11 p.m., and that the reason he knew that it was before 11 p.m. was because his mother, with whom he lived, worked the third shift and she was just getting ready to go to work when he arrived home. During the state's rebuttal closing argument, the prosecutor made the following statement with respect to the defendant's alibi defense: "Is [the defendant]'s alibi any bit believable? Now, he's dropped off at his house on Orange Street. Did the mother come in and testify? Did she tell you—because we have all indications that her car was in the parking lot or the driveway that she would have greeted him, did she come in to say, oh, he came home at eleven o'clock? You didn't hear her testify."

Although *Malave* expressly permits the state to draw a jury's attention to the absence of a corroborating alibi witness, as it did here, and to suggest that the defendant failed to present sufficient credible evidence in support of an alibi defense; *State* v. *Malave*, supra, 250 Conn. 739; it also requires that, if the state wants to do so, it must notify both the court and opposing counsel "in advance of closing arguments." Id., 740. There is nothing in the record indicating that such notice was given in the present case. The prosecutor's argument, therefore, was improper. See *State* v. *Orellana*, supra, 89 Conn. App. 109 (prosecutorial impropriety not to comply with *Malave* notice requirement).

Having determined that the prosecutor made an improper missing witness statement during closing argument, we turn to whether that impropriety deprived the defendant of a fair trial. "[O]ur determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include the extent to which the [impropriety] was invited by defense conduct or argu-

ment . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . . [If] a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Internal quotation marks omitted.) *State* v. *Ross*, supra, 151 Conn. App. 700–701.

Here, the defense did not invite the *Malave* violation, no curative measures were taken by the court, and the impropriety was central to a critical issue, namely, the defendant's alibi defense. Those factors weigh in favor of the defendant. The balance of the factors, however, favors the state. The impropriety was an isolated occurrence and was not particularly severe. The lack of severity is evidenced by the fact that the defendant did not object to the missing witness argument at the time it was made or prior to the court's jury charge. Although failure to object to improper argument does not preclude a later claim of prosecutorial impropriety, defense counsel's failure to make a contemporaneous objection certainly permits an inference that counsel did not think the impropriety was severe, and that it is in part the responsibility of counsel that the impropriety went uncured. See *State* v. *Medrano*, 308 Conn. 604, 621, 65 A.3d 503 (2013). In concluding that the impropriety was not severe, we note that, although the prosecutor failed to give proper notice of his missing witness argument, the argument itself otherwise would have been permissible under *Malave* because the prosecutor did not urge the jury to infer that the defendant's mother's testimony would have harmed the defendant's case.[13]

Finally, the state's case against the defendant was strong. Although the defendant seeks to characterize the jury's verdict as resting solely on the basis of a single eyewitness, that characterization fails to account for other important evidence of the defendant's guilt. For example, Douglas testified that the defendant was at Mary Shepard Place shortly before the victim was shot, and that the defendant and Newkirk were making specific plans to rob a delivery driver. Douglas also testified that the defendant had a revolver that he was carrying in the pocket of his hooded sweatshirt. That evidence strongly corroborates the victim's own account of the attempted robbery and assault that occurred, as well as her eyewitness identification of the defendant as her assailant. In light of our consideration of all relevant factors, we conclude that the single impropriety by the prosecutor did not deprive the defendant of a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant also asserts that the court improperly denied the motion to suppress because, taking into account the totality of the circumstances, the victim's identification lacked reliability. Because we determine that the identification procedures utilized by the police were not unnecessarily suggestive, it is unnecessary for us to address that aspect of his claim. See *State* v. *Boscarino*, 204 Conn. 714, 726, 529 A.2d 1260 (1987) ("[i]f the procedures used to identify the defendant were not unnecessarily suggestive, we need not independently analyze whether the identification was reliable"). Additionally, because we do not reach the reliability prong, we do not address the defendant's arguments advocating for changes to our federal and state constitutional jurisprudence with respect to that prong. See *State* v. *Revels*, 313 Conn. 762, 769 n.5, 99 A.3d 1130 (2014); see also *State* v. *Ledbetter*, 275 Conn. 534, 559–69, 881 A.2d 290 (2005) (previously rejecting requested changes), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

[2] The defendant never filed a motion to suppress Douglas' pretrial identification.

[3] The photographic array also contained the following notice: "You have been asked to look at this group of photographs. The fact that they are shown to you should not influence your judgment. You should not conclude or guess that the photographs contain the person who committed the offense under investigation. You are not obligated to identify anyone. It is just as important to free innocent persons from suspicion as to identify guilty parties. Please do not discuss this case with other witnesses nor indicate in any way that you have, or have not identified someone."

[4] "A double-blind photographic identification procedure is one in which the officer conducting [the procedure] has not been involved in the investigation and does not know who the target is." (Internal quotation marks omitted.) *State* v. *Nieves*, 106 Conn. App. 40, 46 n.6, 941 A.2d 358, cert. denied, 286 Conn. 922, 949 A.2d 482 (2008).

[5] "A sequential photographic identification procedure involve[s] showing the witness the suspect and other fillers on the identification procedure one at a time, rather than the traditional practice of simultaneous presentation." (Internal quotation marks omitted.) *State* v. *Nieves*, 106 Conn. App. 40, 47 n.6, 941 A.2d 358, cert. denied, 286 Conn. 922, 949 A.2d 482 (2008).

[6] A party may functionally preserve a claim for appeal if, although not explicitly raised to the trial court, it is clear from the record that the substance of the claim was raised. See *Fadner* v. *Commissioner of Revenue Services*, 281 Conn. 719, 729 n.12, 917 A.2d 540 (2007).

[7] The defendant also states in his brief that he seeks review under the plain error doctrine. Plain error review "is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Domian*, 235 Conn. 679, 692, 668 A.2d 1333 (1996). The defendant failed to provide any analysis in his main brief as to why plain error review is necessary and appropriate under the facts of this case and, therefore, we deem this request abandoned on the basis of inadequate briefing.

[8] In reviewing the propriety of a pretrial decision on a motion to suppress evidence, this court properly may consider relevant testimonial evidence later adduced at trial. See *State* v. *Boscarino*, 204 Conn. 714, 745 n.14, 529 A.2d 1260 (1987).

[9] During the prosecutor's redirect examination of the victim, the following colloquy occurred:

"Q. When you looked at [the array containing the defendant's photograph] and picked out number six, did you pick out number six because he was wearing a hoodie?

"A. No, sir.

"Q. Now, when you described both of the people that night, can you describe what clothes both of them had on?

"A. They both had black hoodies and jeans on.

"Q. And when you identified number four in [the array containing Newkirk's photograph], is number four wearing a hoodie?

"A. No.

"Q. Are there other individuals in that photo array—people wearing hoodies?

"A. Yes.

"Q. You didn't pick that person out because he was wearing a hoodie?

"A. No.

"Q. Why did you identify these two people [in the photographic arrays].

"A. I seen their faces clearly."

[10] The defendant also briefly makes reference to the legislature's enactment of General Statutes § 54-1p. Section 54-1p, which was adopted after the identifications at issue in the present case, requires municipal police departments to adopt procedures requiring sequential and double blind photographic lineups, as well as an instruction prior to the administration of a photographic lineup that the perpetrator may not be among the persons in the array. This court has made clear that it views the procedures in § 54-1p as reflecting "best practices" that are not constitutionally mandated. See *State* v. *Johnson*, supra, 149 Conn. App. 827 n.9 (rejecting "defendant's contention that the enactment of § 54-1p elevated the best practice procedure of a double-blind array to the level of a constitutional requirement"). It is noteworthy that the statute does not include any remedy for noncompliance, such as imposing a presumption of suggestiveness if the recommended procedures are not followed.

[11] The following exchange occurred between the prosecutor and the defendant:

"Q. And you're saying you didn't commit any shooting that night?

"A. Yes.

"Q. You're saying you didn't have a gun that night?

"A. No.

"Q. Isn't it true that this just didn't go right, this incident?

"A. Isn't it true—

"Q. Yes.

"A. —that it didn't go right?

"Q. Yeah, it just didn't go right?

"A. What do you mean, it didn't go right?

"Q. When you shot and hit that pizza delivery lady?

"A. I didn't shoot anybody.

"Q. You didn't?

"A. No.

"Q. And you didn't have a gun that night?

"A. No, I didn't.

"Q. Have you ever had a gun before?

"A. Nope.

"Q. You never have?

"A. No.

"Q. Do you remember the robbery at Franklin Package store?"

[12] The state contends that the defendant's claims of prosecutorial impropriety are inadequately briefed. We disagree.

[13] Further, the defendant does not claim on appeal that if the state had given the prior notice, he would have proven that she was unavailable to testify.

_____